[L. A. No. 14295. In Bank.—April 1, 1936.]

C. O. MIDDLETON, Plaintiff and Appellant, v. F. P. NEW-
PORT et al., Respondents; FRANCES McCOURT, De-
fendant and Appellant.

Anderson & Anderson, W. H. Anderson, Frank M. Gunter,
Asa V. Call, H. R. Snyder and Call & Murphey for Appel-
lants.

Bailie, Turner & Lake, L. H. Cahill, Everts, Ewing, Wild & Everts, McAdoo & Neblett, John Sobieski, Wm. H. Neblett, E. H. Mitchell and W. C. Shelton for Respondents.

LANGDON, J.—Plaintiff Middleton brought this action to establish an interest in certain lands and to obtain an accounting of money received by defendant Newport from the sale of other land. The controversy arose out of an original partnership or joint adventure in which the above-named parties, both real estate brokers, were engaged in 1913. The trial court gave judgment for defendants on the ground that Middleton had abandoned the project and any right to share in its profits, and also that his claims were barred by the statute of limitations and by laches. The evidence as to the transactions in which the parties engaged is quite detailed, and sharply conflicting views are urged as to the legal effect thereof. Nevertheless, certain facts were satisfactorily proved, and these are sufficient to sustain the findings and judgment. A brief recital of the various transactions will make this clear.

Early in 1913 plaintiff Middleton and defendant Newport began negotiations to buy certain land at Long Beach harbor, owned by Los Angeles Dock & Terminal Company, and consisting of 230 lots and 1,000 feet of harbor frontage. A contract of sale with Middleton and Newport as joint purchasers, at a price of $225,000 payable in instalments, was executed February 12, 1913. Prior thereto the parties had agreed that they would subdivide and sell the property together, each rendering services and furnishing his sales organization.

Neither party intended to put any considerable sum of money into the deal, the venture being wholly a speculative one looking toward the profits that might be made from the efforts of the parties devoted to a selling campaign. Accordingly, in order to raise money for payments under the contract, "Syndicate No. 1" was formed, consisting of Middleton, Newport and several others. An agreement was then made whereby Middleton and Newport contracted to sell their land contract to the syndicate for $275,000 payable in instalments, and thereafter they were to proceed to subdivide and sell the property for $400,000, as agents for the syndicate. By this contract a $50,000 profit (less an agent's commission of $5,000) was contemplated for Middleton and Newport, together with any amount over $400,000 secured from sale of the lots. None

of the syndicate members ever paid more than the first two payments, amounting to $2,500 each.

It may be noted here that the joint adventure of Middleton and Newport no longer possessed any tangible assets, but had merely an agreement offering the members the possibility of profits from their efforts in making future sales of the lots. The $2,500 payments made by Middleton and Newport were as members of the syndicate and did not constitute capital of the joint adventure. Later Middleton sold his syndicate interest to Frank Thomas.

By consent of the syndicate members, it was subsequently agreed that Middleton or Newport should receive compensation of 10 per cent for sales made, which was later increased to 15 per cent, and still later, when Newport alone was making sales, to 25 per cent. In order to facilitate the raising of money by the syndicate, arrangements were completed under which title to 250 feet of the property was placed in the Title Insurance & Trust Company, in trust for the syndicate holders, and as consideration for the release of that property, the Dock Company (the unpaid seller) received $12,500 on the price and a pledge of some of the certificates of interest of the syndicate members. The agreement was concluded September 3, 1913.

Despite his participation in the above modifying agreement, Middleton apparently lost interest in the project shortly after the original agreement of February, 1913. He became interested in another subdivision, and removed his sales organization from the harbor property. He had various discussions with Newport in which he stated that his other ventures were requiring his full attention. There is evidence that Middleton expressed the opinion that the harbor deal was a failure and could not work out. He was asked by Newport what he proposed to do about it and replied vaguely that he would either ''come back into the picture'' or ''dig up some money'' to carry out the agreement. But the witness Olympius, publicity man for the project, testified that in various conversations during 1913 Middleton said that the harbor deal was a failure and that he was through with it and ''wanted to get out from under''. In fact, from March to August, 1913, Middleton's organization made gross sales of $10,500, while Newport's force sold a total of $131,250. In September, 1913, Middleton ceased his sales efforts entirely, and never resumed

them. Thereafter Newport continued to carry on the entire work of sales, bookkeeping and handling contracts, and also alone kept up the obligations, making payments on the original purchase contract, paying taxes and the cost of upkeep of the property, and eventually retiring the syndicate interests by purchasing them. He executed contracts of sale in his sole name as owner and seller.

In 1914 heavy floods ruined the market value of the harbor property. Thereafter Newport was unable to make any headway in sales, many cancellations of contracts occurred, and the venture was continuously delinquent in its obligations for some years. Middleton meanwhile was in financial difficulties with his creditors, and he practically ceased his activities as a real estate broker. In November, 1914, he made an assignment to Lasham and Hill, two of his creditors, of all money to come to him from the joint adventure up to $8,000, the amount due them. Also in that month he made a further assignment of his interest to Dodge and Dudley for the benefit of various creditors.

In 1915 the Dock Company commenced dredging work to restore the harbor, and a contract was made on December 1, 1915, under which Newport agreed to pay $10,000 toward the cost thereof. In order to facilitate the transaction and clear the title to the property so that money might be borrowed on it, Newport assigned his interests in trust to L. V. Draper, and Middleton made a similar assignment to Draper, subject to his prior assignments to Dodge and Dudley. Dodge and Dudley likewise assigned to Draper so that Draper could borrow money for the purpose of paying the Dock Company. Security Trust & Savings Bank, cross-complainant herein, eventually succeeded to the rights of Dodge and Dudley.

As already stated, Newport ultimately carried out the project, paying off the obligations and carrying on sales, without any assistance from Middleton.

The fundamental situation appears quite clearly from these facts. A joint adventure was formed to handle a speculative real estate marketing contract by two persons who were to contribute only their sales organizations and efforts; and one party within a few months abandoned his efforts, and made no active claim of an interest until many years later, when changed conditions had made the venture nursed along by the remaining party a financial success. During most of 1916

and 1917 Middleton did nothing except occasionally ask Newport for a statement. Prior to a sales campaign in 1918, Newport wrote Middleton asking, in effect, for a statement of his intentions, declaring that he did not intend to carry the deal along as a partnership, with no assistance, and then divide the profits. Middleton offered nothing definite at this time, and in February, 1918, left the state for a period of three years, except for short visits, returning in 1921. In May, 1920, he wrote Newport demanding an accounting. Newport did not reply. In January, 1922, he again asked for a statement. Newport's reply was simply that he would be glad to render a statement ''on what is known as the Long Beach waterfront deal''. Nothing came of this. In May, 1924, this suit was filed.

The trial court found that Middleton abandoned the joint adventure in August, 1913; that his subsequent assignment to Draper conveyed nothing, since he had no rights to assign; and that the various other assignments to Draper and the transactions which followed did not constitute a revival of the joint adventure, nor a new agreement between Middleton and Newport.

The court further found that Newport continuously from December, 1914, treated the property as his own and exercised complete management and control over it to the exclusion of Middleton and his successors in interest; that he treated the money derived from sales as his own; that on January 12, 1918, he repudiated in writing any alleged interest of Middleton; and that Middleton and his successors in interest had at all times from December, 1914, notice of Newport's acts and his position in this regard. The court concluded that whatever cause of action Middleton had arose in August, 1913, when the joint adventure was terminated by abandonment; and that some eleven years having passed, the action was barred by the statute of limitations and laches.

There is, as appears above, abundant evidence to support these conclusions of the court. Plaintiff argues that there was a continual recognition of his interest by Newport, both in their correspondence and in his participation in several transactions involving the property, particularly the Draper trust. While these matters are perhaps open to different interpretations, we are satisfied that the trial court was justified in concluding that none of the negotiations had the

effect of reinstating any interest Middleton formerly had as an active participant in the joint adventure.

 It is, of course, entirely possible that an abandonment or dissolution of a partnership or joint adventure may take place by conduct inconsistent with its continuance, in spite of the fact that liquidation is not completed, or that some appearances of partnership continue. (See *Maryland Casualty Co.* v. *Little,* 102 Cal. App. 205 [282 Pac. 968] ; *Sly* v. *Abbott,* 89 Cal. App. 209 [264 Pac. 507] ; 47 Cor. Jur. 1110.) It is further clear that even if Middleton be considered not to have lost all interest in the assets of the adventure by abandonment, still the assertion by Newport of rights of ownership and control to the exclusion of Middleton constituted sufficient repudiation of the latter's rights to start the running of the statute of limitations, both on his personal claim against Newport and on any theory of trust.

It follows that the judgment should be, and it is hereby, affirmed.

Curtis, J., Thompson, J., Shenk, J., Seawell, J., Waste, C. J., and Conrey, J., concurred.

Rehearing denied.