[Civ. No. 13834. Second Dist., Div. Three. Aug. 6, 1943.]

AMELIA C. TSCHUMY, Appellant, v. BROOK'S MARKET et al., Respondents.

Lee J. Myers and Robert Rush for Appellant.

Betts & Garrison and Reginald I. Bauder for Respondents.

WOOD (Parker), J.—Plaintiff appeals from a judgment for defendants, based upon verdicts, in an action for damages for personal injuries sustained by her as a result of stumbling and falling by reason of the alleged negligence of defendants in maintaining a sign. Her contention is that the court erred prejudicially in giving and in refusing to give, certain instructions.

The defendant Stark was the owner and operator of a general retail food market in Los Angeles, known as Brook's Market, which included several departments or concessions. The market building was on the north side of a street and faced south. He also owned a parking lot adjacent to the market building on the west side, which he maintained for the convenience of the patrons of the market. Inasmuch as the solution to a principal question involved herein depends partly upon the arrangement of the market for the arrival and departure of patrons, a detailed description of the entrances should be given. The front line of those two parcels of land, owned by Stark, upon which the market and the parking lot were maintained, was the north edge of the public sidewalk. The front line of the market building did not extend to the sidewalk, but was 7 feet north thereof. The space between the sidewalk and the front of the building was paved with cement. The entire front of the building was open, as an entrance. The parking lot did extend to the sidewalk. In width it extended to the west 55 feet, and in length

from the sidewalk to a point beyond the rear or north end of the market building, and was paved with dark asphalt. The sidewalk, about 12 feet wide, was paved with cement. Those paved areas, that is, the sidewalk, the space between the building and the sidewalk, and the parking lot, adjoined each other and were on the same level. It is to be noted that the south 7 feet of the asphalt pavement on the parking lot adjoined the 7-foot-wide-strip of cement pavement which was in front of the building (which building did not extend to the sidewalk). In other words if the front line of the building were extended westerly across the parking lot, there would be an asphalt paved space 7 feet wide between that line and the sidewalk, and that space would adjoin the cement paved space 7 feet wide which was between the front of the building and the sidewalk. Therefore, the paved area in front of the market building, including the sidewalk, and in front of the front line of the building extended westerly across the parking lot, including the sidewalk, was about 19 feet wide.

The defendant Stark and Brook's Market will be referred to hereinafter as "Stark," and defendant Southern Counties Ice Company will be referred to as "Ice Company."

On August 25, 1939, Stark and the Ice Company entered into a written lease whereby the Ice Company was to erect and operate an ice vending machine on a space 8 feet square in the southwest corner of the parking lot, 4½ feet from the west line of the lot and 1½ feet from the south line, and was to pay a certain amount of money and a percentage of the amount of sales each month as rent beginning October 1, 1939. Stark gave the Ice Company "free possession" and permission, orally and apart from the written lease, to construct the ice vending machine on the leased space at any time after the lease was made.

Two or three days before September 1, 1939, the date of the accident, the Ice Company placed a sign on the parking lot, in or near the area leased, about three feet from the south edge of the sidewalk. A photograph of the sign, received in evidence, shows that it was a portable sign, about 4 feet in height, about 3 feet in width, and about ½ inch in thickness; that the statement on the sign was in substance that an automatic ice vendor would be installed soon on that location; that the part of the sign upon which the words appeared was held in a frame made of strips of iron about 1½ inches in width and about ¼ inch in thickness; that the sign was sup-

ported at its base, so that it would stand, by 4 strips of dark iron of the same width and thickness as the strips in the frame of the sign; that one of the supporting strips of iron was attached to each side of each bottom end of the upright sign so that 2 of the strips extended outward from each side of each bottom end of the sign at right angles to the frame and practically flat on the pavement for a distance of approximately 2 feet; and that, at the point about 2 feet from the frame, each of the four supporting strips was curved upward, then backward toward the sign, and then downward until it formed a ring about 5 inches in diameter at the end of the supporting strip of iron. The asphalt pavement and the iron strips and rings were practically of the same dark color.

Plaintiff, who lived about 2½ blocks southwest of the market, walked from her home to the market on September 1, 1939, about 7 p. m. (The bill of exceptions does not show the date or time, but it is assumed, by reason of statements in the briefs, that the statement just made is correct.) She had patronized the market about 7 years. The entire front of the market building was open, and she entered the building at the west side of the front entrance, i. e., at the southwest corner. She purchased articles in the grocery department and then in the vegetable department which extended out and in front of the building about 4 feet.

Plaintiff left the market from the southwest corner thereof at the same place where she had entered. She was carrying a package of articles she had purchased. From the place where she left the vegetable department, she walked diagonally on Stark's premises, in the direction of her home, toward a point on the public sidewalk about 10 feet east from the southwest corner of the parking lot, a distance of about 45 feet from the southwest corner of the market. She had gone out of the market that same way many times over a period of 7 years. She saw a sign ahead of her and noticed that it stated something about packaged ice, but she did not see any of the iron strips that extended from the sign or any of the iron rings at the end of the strips. When she stepped onto the sidewalk with her left foot and was taking a step with her right foot, her right foot caught in one of the iron rings at the end of an iron strip and she fell upon the sidewalk, receiving a permanent injury to her knee. During a period of several years other customers used the same part of the premises in entering and leaving the market as plaintiff used in

leaving at the time of the accident. It was customary, during the many years plaintiff was a patron of the market, for other patrons who were upon the premises in front of the market or upon the parking lot to approach the front entrance of the market from various directions, and to approach an entrance door on the west side, 20 feet from the front, from various directions. It was also customary for other patrons during that time to leave those entrances in various directions. Plaintiff testified that it was getting dark when she entered the market, and it was dark when she was leaving the premises. As to lighting conditions, there were reflector lights directed upon advertising on the outside west wall of the market building, two lights at the top of a street lighting standard which was on the sidewalk near the curb opposite the place where she fell, and some lights at a gasoline station about 75 feet west.

The gasoline station attendant, who went to the scene when the accident occurred, testified in reference to visibility at the place where the accident occurred that it was "always a darker spot," and that it was a "bad spot," for the reason it was between the brightness of the lights of the market and the brightness of the lights of the gasoline station.

Stark testified that he did not know the sign had been placed on the parking lot, and did not authorize the Ice Company or anyone to place the sign there; that he owned the whole market and the parking lot, and leased portions of the market to various tenants; that he operated the meat department; and that he went to the market about three times each week, but three of his employees were on the premises all of the time.

In its instructions, given at the request of Stark, the court defined the term "licensee," and instructed the jury to the effect that if it found plaintiff was a licensee, and her presence on the premises was unknown to defendants, they were under no duty to her except to refrain from intentional harm or wilful injury; that if plaintiff was not using the parking lot for any purpose intended to result in any benefit to the owner or occupant of the premises, she was a licensee and not entitled to recover unless the injury was the result of a wilful act on the part of the owner or occupant.

The court also gave, at the request of the Ice Company, an instruction in part as follows: "A person who is upon the premises of another for the purpose of transacting busi-

ness is a *licensee* as to those portions of the premises rendered reasonably necessary for his use in the transaction of such business. As to the remaining portions of the premises, however, such a person, even though upon the premises for the purpose of transacting business, is a licensee, and assumes the risk incident to the condition of the premises and the activities there carried on." (Italics added.)

Another part of that instruction, just referred to, was to the effect that if plaintiff, in leaving the premises, for reasons of her own walked upon the parking lot, and her presence thereon was not made reasonably necessary to accomplish her purpose, and if in using said lot she abandoned a known safe means of egress, then she was a licensee and assumed the risks incident to the condition of the lot.

The evidence was undisputed that the kind of business operated by Stark was a large general retail food market to which the public was invited. Also the evidence as to the arrangement of the premises and as to the actions of plaintiff while she was on the premises was undisputed.

The whole area, including the sidewalk, in front of the building and in front of the front line of the building extended westerly across the parking lot to the alley, was paved, level, and to all intents and appearances was a sidewalk about 19 feet wide. The part of the parking lot upon which plaintiff walked was directly west of the cement space, 7 feet wide, in front of the building. As plaintiff left the building she proceeded diagonally across the parking lot toward the sidewalk in the direction of her home. If she had not gone diagonally (southwest) across the corner of the lot, it would have been necessary for her to go (south) about 6 feet to the sidewalk, then turn at a right angle before proceeding in the direction of her home. She started on the lot at a point about 4 feet from the sidewalk, gradually drew nearer thereto, and arrived at the sidewalk after she had gone about 45 feet. The entire distance traveled by plaintiff on the parking lot was very close to the sidewalk. She had gone that way for seven years. It was the custom, according to her testimony and that of the manager of the grocery department, for patrons to approach the front entrance and the west side door, from various directions on the parking lot, and to leave those entrances in various directions across the lot. Plaintiff testified that persons "walked all over the place," and that "they would come from all directions." As above stated, the facts

were undisputed. The arrangement of the premises and the established practice in leaving the premises were such that a reasonable person, situated as plaintiff was, would believe reasonably that the means of departure adopted by plaintiff was open to a patron of the market.

"A business invitation includes an invitation to use such part of the premises as the visitor reasonably believes are held open to him as a means of access to or egress from the place where his business is to be transacted." (Rest. Torts, sec. 343b, p. 942.) ■ An invitation may be manifested by the arrangement of the premises, or by the conduct of the owner. (*Stewart* v. *Lido Cafe*, (1936) 13 Cal.App.2d 46, 50 [56 P.2d 553].) ■ The fact that plaintiff walked to the market, and did not go to the parking lot in an automobile, did not make her status that of a licensee when she was on the parking lot. In the case of *Evans* v. *Sears, Roebuck & Co.*, (1937) (Mo.App.) 104 S.W.2d 1035, the plaintiff had walked to the defendant's store from her home, had crossed the parking lot at the rear of the store, made purchases, and was walking on the driveway of the parking lot on her way home when she slipped and fell by reason of ice on the automobile driveway on the parking lot. She had been a customer of the store about five years and had gone that way to the store about twice a week. There was testimony on behalf of plaintiff, by a person who lived near the parking lot, that "people from all over the neighborhood walked upon and used the driveway and that it was used for driving in and driving out of the parking lot." The only testimony on behalf of defendant related to the weather. The court said at page 1038, ". . . the evidence is sufficient to show that plaintiff was an invitee upon the premises of defendant and not a mere licensee as contended by defendant." It was said further at page 1039, ". . . the evidence is sufficient to show that the use of the driveway and the parking lot by pedestrians for the purpose of entering the rear entrance of the store had become a custom acquiesced in by defendant. Plaintiff, therefore, occupied the status of an invitee."

■ The instructions above referred to relating to a licensee and the duty to refrain from wilful or wanton injury to a licensee were inapplicable to the case. The evidence did not justify any reference to a duty to refrain from wilful or wanton injury. It is agreed that plaintiff's status when she entered the premises was that of an invitee. The invita-

tion to enter included an invitation for plaintiff's departure from such premises over such portions thereof as a reasonable person, situated as plaintiff was, would reasonably believe were held open as a proper means of departing from the premises. The entire front of the market, covering a distance of many feet, was open as an entrance. The pavement in front of the building and the pavement on the parking lot adjacent to the west side thereof, including the sidewalk, all of which was on the same level, constituted a proper means of approach to the front entrance by reason of the physical arrangement of the premises, acquiescence, dedication, and a long established custom. It is to be noted also that the whole parking lot had been used for many years as a means of approach and departure from the west side door of the market. If a patron who departs from the market from the west side door and crosses the parking lot is an invitee, it would seem there would be no basis for a contention that a patron who departs from the front entrance and crosses a corner of the parking lot is not an invitee. ''. . . where there is no conflict in the evidence upon which the determination of a question of law rests the decision is for the court and it should not be submitted to the jury.'' (*Adrian* v. *Guyette,* (1936) 14 Cal.App.2d 493, 504, 505 [58 P.2d 988].) The plaintiff was an invitee. The instructions above referred to, being inapplicable to the case, tended to confuse the issues.

It is to be noted that one of the above instructions, given at the request of the *Ice Company,* was in part as follows: ''A person who is upon the premises of another for the purpose of transacting business is a *licensee* as to those portions of the premises rendered reasonably necessary for his use in the transaction of such business.'' Of course, that was not a correct statement of the law. Apparently it was intended that the word ''invitee'' should be used in that sentence instead of the word ''licensee.'' An examination of the original instruction in the files of the superior court shows that the word ''licensee'' is the word in the original instruction, and therefore the word ''licensee'' appearing in the bill of exceptions was not a typographical error. The giving of that instruction, requested by the Ice Company, although the word *''licensee''* might have been used inadvertently therein, was conflicting with other instructions correctly defining the words ''invitee'' and ''licensee,'' and therefore increased the confusion caused by the other instructions, given at the re-

quest of Stark, relative to a "licensee." The above instructions were erroneous prejudicially.

The court also gave, at the request of Stark, an instruction in part as follows: ". . . if you believe from the evidence in this case that the ground upon which the defendant Ice Companies [sic] sign was placed was at that time leased to the Ice Company by the defendant Meyer Stark, the defendant Meyer Stark would not be liable for any injury sustained by the plaintiff as a result of the Ice Company having placed its sign upon such land and under these circumstances your verdict must be for the defendants Meyer Stark, Meyer Stark doing business as Brooks Market, and Brooks Market."

The written lease, covering a space of 8 feet square near the southwest corner of the parking lot, was made on August 25, 1939, for a term commencing October 1, 1939. Stark testified that the Ice Company was to have *free possession* as soon as the lease was signed in order to erect the ice machine before October 1st. There was no designation upon the surface of the lot, or upon the sign, and there was no designation at all, to indicate that a part of the lot had been leased. There was nothing to indicate to plaintiff or other patrons of the market that there was a change, if any, by an oral or written lease or at all in the custom that had prevailed for several years whereby the patrons of the market were permitted by Stark, the owner of the market and lot, to approach and depart from the market across the parking lot; nor was there anything to indicate to such patrons that a small portion of the lot, 8 feet square or any other size, at some undesignated place on the lot was to be excluded from the usual and customary places over which the customers were allowed by many years of acquiescence to go and come in patronizing the market. Since the term of the written lease did not commence until October 1st, it appears that the Ice Company itself was permitted to be upon the 8-foot-square-portion before October 1st only by the invitation or acquiescence of Stark. In any event, the small portion of the lot, undesignated as to location insofar as the patrons were concerned, was in the customary passageways on the market premises to and from the market building. At the time of the accident, irrespective of the written lease, Stark had retained the rights of use and passage over the space which was at some later date to be occupied by a small building, but also had permitted the Ice Company

to go upon that space. In the case of *Brown* v. *Pepperdine,* (1921) 53 Cal.App. 334 [200 P. 36], it was said at page 336, ". . . the defendants having retained the right to use the driveway in common with their tenant, they are liable for an injury sustained by persons rightfully visiting such tenant due to their ordinary negligence." In the case of *Van Wye* v. *Robbins,* (1941) 48 Cal.App.2d 660 [120 P.2d 507], the owner of a market and the operator of a service station which was adjacent to the market entered into an oral agreement whereby the customers of the market were allowed to park their cars on the service station premises. A patron of the market fell by reason of slipping on grease that was on the service station parking area. In rejecting the contention of the market owner that he was not liable for the negligence of the proprietor of the parking lot the court said, at page 662: "The latter's [market owner] liability rests on the rule that if one invites another to use his premises and the invitee is injured due to the negligent manner in which the premises are maintained, the invitor is responsible for the resulting injury to the invitee." The above instructions to the effect that Stark was not liable if he had leased the premises were erroneous prejudicially.

██ It was stipulated between plaintiff and the Ice Company that the Ice Company placed the sign within the area leased, but Stark refused to join in that stipulation. It does not appear that the sign was within that area at the time of the accident. On the contrary, the location of the sign as marked by plaintiff on the map of the premises, received in evidence, shows that the sign was entirely outside of that area, and the nearest part of the sign was about ½ foot from the southeast corner of that area. If the sign was not in that area, of course, instructions relative to the Ice Company's duty to a licensee would not be proper. Even if it were assumed that the sign was on the said area, instructions regarding a licensee should not have been given. It appears, as above stated, that at the time of the accident the Ice Company itself was permitted to be upon that area only by the invitation or acquiescence of Stark. Also, as above indicated, plaintiff was an invitee of Stark. The Ice Company as an invitee or licensee owed plaintiff as an invitee the duty of exercising ordinary care. In the case of *Pease* v. *San Diego Unified Sch. Dist.,* (1942) 54 Cal.App.2d 20 [128 P.2d 621], a public school leased its auditorium to the Salvation Army

which placed some wire across a walk in order to install a public address system. The plaintiff, a student in the school, fell and was injured when she tripped on the wire. The court said at page 23, ''Both the appellant [Salvation Army] and the respondent [student] were invitees of the owner of the premises and as such each was under the duty of using ordinary care with respect to matters which affected the safety of the other.''

It is not necessary to discuss the other instructions.

The judgment is reversed as to defendant Stark, doing business as Brook's Market, and as to defendant Southern Counties Ice Company.

Shinn, Acting P. J., and Bishop, J. pro tem., concurred.