[Civ. No. 18771.   Second Dist., Div. Two.   June 20, 1952.]

RENA C. SIBERT, as Administratrix, etc., et al., Respondents, v. GEORGE W. SHAVER, Appellant.

834

Demetriou & Viney and Stanley M. Arndt for Appellant.

Irving M. Walker and Richard L. North for Respondents.

MOORE, P. J.—The judgment herein is (1) for the enforcement of a rescission of an assignment of respondents'

interest in an invention for potato slicing and in the letters patent to be issued thereon; (2) for respondents and appellant as owners to vest title to the patent in the partnership formed by appellant and decedent for the manufacture and sale of the device based upon such invention; (3) for the partnership to be wound up and settled by appellant who must account to the probate court for the interest of decedent. Appellant demands a reversal on the grounds of the insufficiency of the proof, inconsistency of the findings and lack of support for the conclusions of law.

Clarence Sibert died intestate October 9, 1937, leaving his widow Rena and their daughter Mary Jane. Prior to his decease, he and appellant had long been intimate friends, Shaver having married decedent's sister. They were frequent visitors in each other's home. George Shaver was a salesman of market equipment merchandise while Clarence Sibert was a talented jewelry manufacturer. When in 1935 George became convinced of the need for a potato slicer, he told Clarence who promptly commenced work on the invention and thenceforth worked on the device continuously at nights. Shaver purchased the requisite materials and assisted Clarence. Finally they triumphed. They filed an application for letters patent on June 10, 1936, as joint inventors of the slicer and stated they were partners. Sales were immediate, 60 having been made prior to December 1, 1936, at $35 each.

The behavior of the men about the time of their beginning the project is important to the elucidation of the issues. On June 5, 1936, they stated they were partners in their application for a patent. On other previous occasions they had stated in their conversations that they were to do business as partners. February 8, 1937, they filed a certificate with the county clerk that they were doing business as a partnership under the fictitious firm name of S & S Specialty Company and immediately filed a complaint against their debtor alleging they were doing business as partners under the fictitious firm name. Thus, the partners continued their operations until October 9, 1937, when Sibert deceased.

Prior to the passing of her husband Rena Sibert had been an invalid resulting from a nervous breakdown. She had lost weight from 175 to 85 pounds; suffered hallucinations and incoherency of speech. While she was confined in a sanitarium Clarence dined at the Shaver home. As Rena gradually improved appellant continued to carry on the business of the

S & S Specialty Company but said nothing to Rena and Mary Jane about his achievements.

Shortly after Clarence died Rena had herself appointed guardian of Mary Jane so the daughter might receive the proceeds of an insurance policy on her father's life. During the course of that proceeding, the widow spoke to Attorney Nevitt of the slicer and of her husband's interest. Pursuant to her suggestion, the lawyer had Shaver call to discuss the invention and the interest of decedent's family in it. Appellant told Rena and her lawyer that he was not manufacturing the device; that it was not going yet and was of little value; that Clarence had no interest in the business; that the patent had not been issued and it would probably never amount to anything.[1] Also, Shaver told Nevitt that he would pay Rena $200 and return a bar pin which Clarence had made for her and which he had pledged to George as security for a loan of $105.

Nevitt reported the offer to Rena and thereafter advised her that Shaver wished her and Mary Jane to visit his home and get the money and the pin. He declined to advise them as to the course they should pursue. They did call alone, executed the assignment—already prepared by Shaver's attorney and approved by Nevitt "as to form and substance." Shaver told them that while they had no interest in the invention they were signing the writing to clear the record. Rena received the promised consideration; but Mary Jane collected nothing. To this time the two women had confidence in Shaver, believed in him and relied upon his statements relative to the ill-success of the invention and executed the assignment solely by reason of their reliance upon his representations and by reason of their ignorance of the true status of the slicer, its adaptation to the needs of the trade, George's success in promoting sales and the profits realizable thereon.

After Sibert's decease his surviving partner continued the manufacture and sale of the machine under the partnership name but never divulged a word to respondents of the success of the enterprise, the number of sales, the cost of manufacture and the profit earned on each delivery. As the months rolled along and vigor and imagination returned to Rena she awoke to new courage and the mother and daughter began to dream again of the world that might have been if the plans of Clarence Sibert had materialized. Some two and a half

---

[1]Three weeks later the patent was issued to Clarence Sibert and George Shaver.

years after they had given Shaver the assignment, to wit, in November, 1940, Mary Jane made a friendly call at the home of Attorney Crum. While there she engaged him in discussion about the possible rights she and her mother might establish in the invention of her father, and related their conversation with Shaver at the time of making the assignment. Subsequently Crum advised Mary Jane of his doubt that the assignment could be annulled despite Shaver's misrepresentations as to the ownership of the patent. At the trial Crum testified that he had researched the question of the assignment of "rights that might lead to a patent" but he knew nothing of the facts of the case other than the execution of the assignment "and now wondered" whether it was possible that the women did have some rights. Although he had not seen the assignment he advised against litigation by reason of the expense of making the necessary investigations and because of the mental illness which Rena had suffered.

When in 1946 Mrs. Sibert heard that appellant "had made a million dollars" out of the slicer, she consulted Attorney North. He promptly made an exhaustive investigation of all the facts and of the circumstances of the invention, partnership, application for letters. After having received a report from the patent office he called upon Shaver at the S & S Specialty Company and requested an inspection of the document signed by respondents. Appellant told the attorney that Rena "had been confined in a mental institution and was still crazy" but he promised to get the writing from his lock box. On his call two days later Mr. North examined the assignment and promised to investigate further and report his findings.

Not only did the attorney discover the certificate of fictitious firm name filed by the inventors but during a period of 18 months he visited numerous cafés, drive-ins, kitchen-supply houses and such other places as might use the slicer. He determined that the device had been on the market since a time antedating the assignment in May, 1938, and that Shaver had made numerous sales from August, 1936, to May, 1938, and that the slicer's value was well established. Thereupon, on September 24, 1947, Rena caused a notice of rescission of the assignment to be served upon appellant. The demand was based on the grounds of fraud, undue influence and mistake of fact.

Mrs. Sibert having qualified as administratrix of her husband's estate in December, 1947, in March, 1948, her attorney

examined Shaver in a probate proceeding. Appellant at that time denied (1) that he had ever entered into a partnership with Clarence, (2) that his brother-in-law was owner of a half interest in the invention, and (3) that S & S Specialty Company existed prior to 1940. He testified that prior to the death of Clarence only four experimental models of the slicer had been built; that he had no records; that no slicers had been sold prior to the passing of decedent; that his records showed that 10,000 slicers were sold between 1940 and March 10, 1948; that he had always dealt with the invention as his own and that he had never known that Rena had been confined in a place for cases of mental illness. Despite such denials and testimony of Shaver, as well as his refusal to cooperate in developing the truth, in August, 1949, respondents filed this action to enforce the rescission of the assignment.

## FINDINGS HAVE SUBSTANTIAL EVIDENTIAL SUPPORT

That George and Clarence invented the device together as partners, applied for a patent and made the invention an asset of the partnership is clearly established by the proof and by reasonable inferences. The filing of the certificate of a fictitious name and the affidavit attached thereto, the allegations of their complaint filed against a salesman they had employed to make sales, are written evidence which, alone, would have supported the finding of a partnership. In addition there is persuasive parol proof. While the application for a patent was not on a partnership form, the notary who took their acknowledgments testified that "they said they were partners in the application." Moreover, when, on one occasion the families were gathered at the home of Mrs. Taggart, Shaver said, "Clarence, make us a potato cutter and we will do all right." Clarence agreed and commenced at once and continued work on the invention. The witness, Mrs. Weber testified that she had accompanied the inventors to San Diego where she was to introduce them to her friend, a patent attorney, and that in their conversation en route they declared their business in connection with the slicer was on a partnership basis. Such evidence takes on added emphasis in the light of the fact that the brothers-in-law at the beginning agreed upon equal capital contributions, shared expenses for materials and worked together in developing the plans and specifications for the new device. The mere fact that the men made the application in their joint names does not compel a determination that the invention was not a partnership asset as distinguished from a tenancy in common. While consulting

the San Diego attorney it is not unlikely that he neglected to develop the plans already agreed upon.

Conceding the fact the utmost value as proof of appellant's claim, it goes no further than to create a conflict which was resolved against him. ■ But appellant insists that the allegation of the complaint does not support the finding. The complaint alleges that "at the time of his death the decedent was the owner of an equal one-half interest in and to said invention, and letters patent and in and to said partnership." The finding is that each held a one-half interest in the slicer, but subject to an agreement that the invention should be an asset of the partnership. Such slight variance does not create an irreconcilable conflict. ■ That appellant misrepresented material facts relative to the partnership is established by the factual situation already recited. Appellant's positive declarations to Rena that Clarence had no interest; nothing had been done toward marketing the slicer; it "wasn't going yet"; it is of little value; no sales had been made,—these were misrepresentations with reference to material facts which, alone, would have warranted rescission. But besides such misstatements the court could not but be impressed by the concealments of important facts from the women. Both of them were in complete ignorance of the status of the slicer's development and of its commercial value. But equally as potent ground for rescission was respondents' reliance upon and confidence in appellant. Neither of them had ever had experience in inventions, patents, promotions or sales. Mary Jane was not of age until the very day of the assignment and Rena's mind had suffered a serious impairment. In view of such evidence and its adoption by the court relief from the finding is unspeakable in view of the proof that at least one hundred slicers had been produced and sold by 1938— many of them prior to Clarence's death. In addition to the foregoing Rena proved that Shaver had told her that she must execute the assignment in order to regain her bar pin pledged to Shaver. While that fact was not recited in the notice of rescission, the truth of it indicates that the trial court believed that appellant would not hesitate to oppress the unfortunate related to himself by family ties.

■ A surviving partner is a trustee of the trust inherited from his decedent, and of the assets of the partnership. As such he owes the maximum of good faith and personal confidence to the decedent and to the latter's beneficiaries. (Civ. Code, § 2219.) In all matters connected with his trust, the

trustee is bound to act in the highest good faith toward his beneficiaries. (Civ. Code, § 2228.) ▮ A surviving partner continues as trustee subject to the obligations of a voluntary trustee. (Corp. Code, § 15030; *Smith* v. *Walker,* 38 Cal. 385 [99 Am.Dec. 415].)

### ACTION NOT BARRED BY THREE-YEAR STATUTE

▮ Appellant contends that even though fraud and oppression were established, rescission was barred by the three-year statute. (Code Civ. Proc., § 338(4).) He argues that the letter of Attorney Crum establishes that as of 1940 respondents knew that certain statements made to them by appellant were false and necessarily the statute of limitations commenced to run when they acquired such knowledge. Such argument is predicated upon the assumption that Crum was actually aware of Shaver's misrepresentations or knew such facts as should have put him on notice that the assignment was not the result of fair dealing by Shaver, citing *Nelson* v. *Nelson,* 131 Cal.App. 126, 131 [20 P.2d 995].

But Crum was not so circumstanced as to be fairly chargeable with notice of the fraud. While his letter indicates that he had such knowledge his testimony discloses the true situation. All he knew was that an assignment of some sort had been executed. He testified that any references in his letter to misrepresentations of Shaver were based upon his own assumption since he had no actual knowledge of the facts and respondents were unable to supply him with specific details.

Appellant assigns as prejudicial the court's conclusion that laches was not available to him as a defense. Such ruling was correct. ▮ The mere lapse of time does not mean laches. To make that doctrine applicable it must be made to appear that the party who interposes it as a defense has suffered prejudice by virtue of the delay in commencing his action. Appellant attempts to bring himself within the rule by his claim that Attorney Nevitt had deceased and that since he was the only disinterested witness to Shaver's declarations upon which Rena relied his demise has prejudiced appellant's cause. But there is no indication that Nevitt's testimony would have supported appellant. Shaver denied a partnership with Sibert ever existed and that Clarence had any interest in the business or in the assets on hand. By virtue of his denials that Clarence ever had an interest in the invention and of his concealment of all his information relative to the joint undertaking with his brother-in-law, appellant caused the delay. But appellant contends that the knowledge of

Nevitt was to be imputed to his clients even though he might not have communicated his information to respondents they are deemed to have received it and therefore they are chargeable with the delay, again relying on *Nelson* v. *Nelson, supra.* That decision is not pertinent. Not only did the attorney therein have full knowledge of the fraudulent probate sale complained of but likewise did a number of the plaintiffs. In spite of such knowledge they released the defendant administratrix of liability for her act.

█ The court's finding that respondents rescinded promptly is not arbitrary but is supported by the proof above recited. It cannot, therefore, be disturbed. (*Philpott* v. *Superior Court,* 1 Cal.2d 512, 524 [36 P.2d 635, 95 A.L.R. 990] ; *Reiniger* v. *Hassell,* 216 Cal. 209, 211 [13 P.2d 737].) █ It follows that since appellant's continued concealment of the true facts as well as his express statements of untruths which they believed caused Rena and Mary Jane to delay their demands, he is estopped from pleading either laches or the statute of limitations. (*Hansen* v. *Bear Film Co.,* 28 Cal.2d 154, 178 [168 P.2d 946] ; *Benner* v. *Industrial Acc. Com.,* 26 Cal.2d 346, 349 [159 P.2d 24] ; *Pashley* v. *Pacific Electric Ry. Co.,* 25 Cal.2d 226, 229 [153 P.2d 325].)

ACTION TO ESTABLISH PARTNERSHIP

█ Because the period of limitation commences with the dissolution of a partnership (*Shearer* v. *Davis,* 67 Cal. App.2d 878, 881 [155 P.2d 708] ) and since Clarence's death dissolved the S & S Specialty Company (Corp. Code, § 15031(4)), appellant contends that the count to establish the partnership, wind up its affairs and make an accounting is barred by the four-year statute of limitations. (Code Civ. Proc., § 343.) Such a bar cannot be successfully raised in the situation here involved. Commencing with the first negotiations between the parties and continuing beyond the assignment of the patent to the time of trial, appellant never ceased to repeat his denial of the partnership. The statute of limitations may not be invoked where he fraudulently conceals the existence of a fact which he was in duty bound to disclose. (*Hansen* v. *Bear Film Co., supra,* 178; *Sears* v. *Rule,* 27 Cal.2d 131, 147 [163 P.2d 443] ; *Pashley* v. *Pacific Electric Railway Co., supra,* 229.) But appellant did not content himself with denying the partnership with Sibert. He steadfastly and continually repeated that (1) the invention was valueless, and (2) there was no manufacture and sale of the slicer. Also, he concealed through March, 1948,

that (1) he and Sibert had instituted a business that continued till his death; (2) he had records of the business, commencing with 1936; (3) 100 slicers had been sold by the partnership in November, 1936; (4) the partnership had operated prior to 1940; (5) records of the business prior to 1940 were in the books; (6) he could not get a Canadian patent by reason of the fact that Sibert's estate had not been probated. Respondents were persuaded by appellant to believe that further inquiry as to their rights would be useless. Appellant's actions are all the more grievous when it is borne in mind that he occupied the position of a trustee as to the deceased partner's interest. (*Ruppe* v. *Utter*, 76 Cal.App. 19, 25 [243 P. 715].) Hence, he was in duty bound to make a full disclosure to the beneficiaries of Clarence's estate and will not now be permitted to capitalize on his unconscionable conduct by seeking refuge behind the statute of limitations.

Appellant also contends that, assuming the judgment to be otherwise correct, it was error to compel him to account for profits earned after the death of his partner, citing *Hall* v. *Watson*, 73 Cal.App.2d 735 [167 P.2d 210]. But the cited decision emphasizes that one may share in profits earned after dissolution of a partnership where the partner seeking a portion of such profits has an interest in the assets or capital of the firm after dissolution. Only in the event the complaining partner has no interest in the assets or where his interest is negligible is he barred from asserting claim to a share of the profits.

In the case at bar the patented device was a valuable partnership asset. It caused S & S Specialty Company to mushroom into a fruitful enterprise of rare promise. It is meaningless for appellant to assert that it had no value in view of its immediate acceptance by the trade and especially in view of its subsequently proven popularity.[2]    Accordingly, since appellant was in the position of a trustee as to the deceased's interest in the firm, his use thereafter of the assets without regard to any winding up of the business places him in the discomfiting position of being held to account for profits earned subsequent to Sibert's decease. (*Fooshe* v. *Sunshine*, 96 Cal.App.2d 336, 343 [215 P.2d 66, 16 A.L.R.2d 1143]; *Ruppe* v. *Utter*, 76 Cal.App.19, 25 [243 P. 715].)

It is also asserted that the trial court erred in rendering judgment in favor of Mary Jane inasmuch as any interest

---

[2]Appellant testified at the 1948 probate proceeding that at least 10,000 slicers had been sold to that date.

which Clarence might have held at his death was presumably community property and would pass to the widow alone under our intestacy law. (Prob. Code, § 201.) However, the judgment though providing that Rena and Mary Jane as heirs at law of Clarence are the owners of a half interest in the patent, provides further that such interest is subject to the administration of the Sibert estate. It is presumed that the probate court will make lawful and valid orders in its decree of distribution.

Judgment affirmed.

McComb, J., and Fox, J., concurred.

A petition for a rehearing was denied July 9, 1952, and appellant's petition for a hearing by the Supreme Court was denied August 14, 1952. Edmonds, J., and Schauer, J., were of the opinion that the petition should be granted.