[Civ. No. 57194. Second Dist., Div. Five. May 19, 1981.]

Estate of JAMES E. FINCHER, Deceased.
BARBARA FINCHER, Contestant and Appellant, v.
CALVERT FINCHER, as Executor with the Will Annexed, etc., et al.,
Claimants and Respondents.

COUNSEL

Williams & Williams, Williams, Williams & Furukawa, Ernest George Williams and Leslie K. Furukawa for Contestant and Appellant.

Neiman & Billet, Allen I. Neiman, Patricia M. Wolfe and Doane Brakemeyer for Claimants and Respondents.

OPINION

KAUS, P. J.—This case involves an attempt by a widow to enforce a claimed *"Marvin-*type" agreement[1] with respect to a period of years during which she and her late husband lived together before they were married.

---

[1]See *Marvin* v. *Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106].

## FACTS

Barbara and Jim Fincher were married on March 5, 1976, a little less than two years before Jim's death on January 1, 1978. Barbara and Jim had lived together on an off-and-on basis from 1964 to July 1971 when they terminated their relationship.

Barbara lived with Michael Hefferon from December 1971 until she married him in March 1972. Barbara and Hefferon separated in 1973; she secured a dissolution from Hefferon on January 5, 1976.

Barbara had resumed her relationship with Jim in November 1975. It continued without interruption until Jim and Barbara were married in March of 1976.

Jim executed a will some four months before his death from cancer. In the will he made specific bequests amounting to $40,000 to two close friends. He also left $35,000 in trust for his only grandson's education. The remainder of his estate—about $50,000—was left to Linda S. Smith, Jim's only daughter, an unmarried epileptic in her mid-thirties. With respect to Barbara the will provided as follows: "I have intentionally and with full knowledge omitted any provision in this Will for my wife, BARBARA L. FINCHER, not out of unkindness toward her, but because I have provided for her otherwise than through participation in the distribution of my estate." Barbara was the beneficiary of Jim's $50,000 life insurance policy.

The will was admitted to probate on February 3, 1978. In seeking to assert a claim to a larger portion of the estate than she might have been entitled to as the disinherited surviving spouse of the two-year marriage, Barbara chose two procedural avenues. On March 31, 1978, she filed a "Petition for Revocation of Probate" alleging that the September 16 will was the result of fraud and undue influence exercised by Jim's brothers and his daughter, and that Jim signed a holographic will sometime after the September 16 will, which was, however, destroyed by Jim's brothers and his daughter.[2]

---

[2]In the same pleading, Barbara sought to attack the validity of a buy-sell agreement entered into in January 1971, between Jim, his brother Don Fincher, and two corporations, A. V. Ready Mix, Inc. and Mojave Mill and Equipment Company. Jim and his brother Don were the sole shareholders of the two corporations. Under the terms of the 1971 buy-sell agreement, in the event of his death, Jim's interest in the two corporations was to be sold to the corporations for the sum of $200,000. The agreement was

Her second procedural move was to file a "Petition for Determination of Entitlement to Distribution of Estate" (Prob. Code, § 1080) alleging that she was entitled to one-half of Jim's entire estate by virtue of her combined status as surviving spouse and as a partner of their alleged "*Marvin* partnership" which existed from May 1964 to July 1971, and from November 1975 to March 4, 1976.

On October 4, 1978, Barbara filed a notice of demand for jury trial with respect to both of her petitions. At the commencement of the trial respondents questioned the court as to how it intended to handle the defenses they wished to raise to Barbara's claim of a *Marvin* partnership, such as the statute of limitations, estoppel, waiver, abandonment and laches. The court stated: "I will consider all of your special defenses. I'm going to require that you set them forth in writing. I am going to perceive that we will proceed with the jury trial at this time, and I will try the equitable defenses at the conclusion of the jury trial, the equitable non-jury defenses. If you wish to have the Statute of Limitations tried by a jury, I think you are entitled to it."[3]

The matter proceeded to a jury trial[4] and at its conclusion the trial court took the issue of the applicability of the statute of limitations from the jury announcing that it should be determined as a matter of law, not fact. With respect to Barbara's petition to revoke probate, the jury found that execution of the September 16 will was not obtained through undue influence or fraud. With respect to Barbara's petition for a determination of heirship under Probate Code section 1080, the jury found that Barbara and Jim's conduct during the period from May 1964 to July 1971, demonstrated an implied *Marvin* agreement and that Barbara and Jim entered into an express *Marvin* agreement in No-

---

funded by an insurance policy on Jim's life in that amount. Barbara asserted that at the time of his death, Jim's interest in the two corporations was worth in excess of $1 million, and that the agreement was illusory and should fail for lack of consideration. At the commencement of the trial herein the court bifurcated and reserved any issue as to the validity of the buy-sell agreement, which is also the subject of another civil action pending at the time of the trial court's ruling. (L. A. Super. Ct., case No. NWC 64835.) Appellant requests that this court take judicial notice of the civil action contesting the validity of the buy-sell agreement. The record in the civil action was received in evidence by reference.

[3]The trial court reiterated on several occasions its intention to decide the issues pertaining to the affirmative defenses in a nonjury hearing after the jury trial was complete. At no time did Barbara's attorney object to this procedure.

[4]At the conclusion of Barbara's case a nonsuit was granted with respect to her claim that a later holographic will revoked the September 16 will.

vember, 1975, when they reunited after Barbara's brief marriage to Hefferon.[5]

The jury was excused. Judgment for respondents was ordered on the will contest and trial was continued to December 12, 1978, for determination of the affirmative defenses. At that hearing the trial court determined that insofar as Barbara and Jim's *Marvin*-relationship from 1964-1971 gave rise to an actual contract, the statute of limitations began to run in July 1971 when the parties separated and that it constituted a bar to enforcement of that contract. It also found that if the *Marvin* relationship gave rise to a partnership, the equitable defenses of both waiver and laches were applicable.

The court found that Barbara had a community property interest in Jim's estate from the time of Barbara and Jim's marriage in 1976 until Jim's death in 1978. The court determined that Barbara had a "partnership interest that is equivalent to a community property interest" for the period from November 1975 to the date of Barbara and Jim's marriage in 1976.

Barbara appeals from the judgment claiming that the trial court committed prejudicial error in denying her a jury trial on the affirmative defenses and that there was insufficient evidence to support the trial court's finding that enforcement of the implied *Marvin* agreement or partnership was barred by the statute of limitations, laches or waiver.

## Discussion

An heirship proceeding under Probate Code sections 1080-1082 is a specialized proceeding in rem, the sole purpose of which is to "determine who are the heirs of the decedent or entitled to distribution of the estate and [to] ... specify their interests." (Prob. Code, § 1081; see *Estate of Neilson* (1962) 57 Cal.2d 733, 748 [22 Cal.Rptr. 1, 371 P.2d 745]; *Estate of Radovich* (1957) 48 Cal.2d 116, 120 [308 P.2d 14]; *Estate of Wise* (1949) 34 Cal.2d 376, 383 [210 P.2d 497].)

In view of the limited function of an heirship proceeding, we had serious reservations as to whether it was an appropriate vehicle to establish

---

[5]Barbara made no claim to any rights arising out of the period from July 1971 to November 1975.

the existence of a *Marvin* agreement or partnership. Since neither party raised this issue, we requested further briefing on the question "whether the probate court had jurisdiction or power to determine the existence of a *Marvin* agreement or *Marvin* partnership in an heirship proceeding under the provisions of Probate Code section 1081...." We first address this question.

█ Probate Code section 1080 provides in part that "any person claiming to be an heir of the decedent or entitled to distribution of the estate or any part thereof may file a petition setting forth his claim or reason and praying that the court determine who are entitled to distribution of the estate." In the usual case of a nonmarital relationship, where one of the partners dies and the surviving partner is not made a beneficiary under the decedent's will, the surviving partner cannot claim to be an heir of the decedent's estate. A *Marvin*-type relationship would not automatically give the surviving partner any property interest in the decedent partner's estate. *Marvin* held that the provisions of the Family Law Act do not govern the distribution of property acquired in a nonmarital relationship, but that, when they are proved, the courts should enforce express contracts between nonmarital partners concerning distribution of such property as well as implied contracts, agreements of partnership or joint venture, etc. (*Marvin* v. *Marvin, supra*, 18 Cal.3d at p. 674. See also *Planck* v. *Hartung* (1979) 98 Cal.App.3d 838, 841-842 [159 Cal.Rptr. 673]; *In re Marriage of Leib* (1978) 80 Cal.App.3d 629, 642 [145 Cal.Rptr. 763].)

In her petition Barbara stated what was essentially a claim based upon an oral contract, not a claim to an interest in particular estate property. Such a third party claim would be one adverse to the estate and would not be cognizable in a proceeding under Probate Code section 1080. Here, however, Barbara was married to Jim at the time of his death. As Jim's surviving spouse she was an heir within the meaning of Probate Code section 1080 and as such had a right to assert her claim to true community property rights in an heirship proceeding.[6] (See *Woods* v. *Security-First Nat. Bank* (1956) 46 Cal.2d 697, 704 [299 P.2d 657]; *Estate of Roberts* (1945) 27 Cal.2d 70, 75 [162 P.2d 461].)

---

[6]In her petition Barbara claimed that all the property left by Jim was either community property or property subject to the alleged *Marvin* agreement or partnership and that she was entitled to one-half of it.

Since the probate court had jurisdiction to determine Barbara's community property claim, should she have been forced to litigate her *Marvin* claim to the other property in Jim's estate in a separate proceeding? The court in *Estate of Baglione* (1966) 65 Cal.2d 192 [53 Cal.Rptr. 139, 417 P.2d 683] answered "No" to a very similar question. In *Baglione* the surviving wife, in an heirship proceeding pursuant to Probate Code section 1080, sought to establish her right to succeed to all of certain real property near Lake Tahoe. Decedent husband had willed his share of the property to certain named relatives. The wife sought her community property share and also claimed the entire property based on an alleged oral contract that she had made with her husband to the effect that upon the death of either of them all property accumulated during the marriage should go to the survivor. The probate court found the property was community property, but refused to consider the wife's contract claim on the ground that it had no jurisdiction over such a claim. The Supreme Court determined that the probate court erred in refusing to determine the wife's contract claim, but that the error was not prejudicial under the circumstances because the wife had later sought enforcement of her contract claim in a separate action in which it was correctly determined that her claim was barred by the statute of frauds. In discussing the probate court's jurisdiction, the Supreme Court stated: "To deny a superior court sitting in probate the power to determine the whole controversy between the parties before it is pointless. In the exercise of its legal and equitable powers (see *Schlyen* v. *Schlyen, supra*, at p. 371; *Estate of Cover*, 188 Cal. 133, 139 [204 P. 583]), a superior court sitting in probate that has jurisdiction over one aspect of a claim to certain property can determine all aspects of the claim. A claimant is not required to sever and litigate a multifaceted claim in separate proceedings once all the necessary parties are before the court. Thus in the instant case, once the court determined that Marie had a community interest in the Lake Tahoe property subject to probate, it should have resolved the entire controversy and determined her rights to that property under the alleged oral agreement with the deceased. Any statements in *Sieroty* v. *Silver*, 58 Cal.2d 799 [26 Cal.Rptr. 635, 376 P.2d 563], and *Smith* v. *Smith*, 220 Cal.App.2d 30 [33 Cal.Rptr. 559], to the contrary are disapproved." (65 Cal.2d at p. 197.) So too in the case before us, once Barbara was properly before the probate court seeking a determination of her community property interest in her husband's estate, the trial court had the power to determine the whole controversy including her claim under the alleged *Marvin* agreements.

Turning to the merits, Barbara contends, first, that the trial court committed prejudicial error by denying her a jury trial as to her affirmative defenses.

■ With respect to the equitable defenses of waiver and laches, it is settled that a trial court may try equitable issues separately even when legal issues in the case are tried to the jury. (See *Raedeke* v. *Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671 [111 Cal.Rptr. 693, 517 P.2d 1157]; *Connell* v. *Bowes* (1942) 19 Cal.2d 870, 872 [123 P.2d 456]; *Moss* v. *Bluemm* (1964) 229 Cal.App.2d 70, 73 [40 Cal.Rptr. 50].) Nor does it matter that in this case the court determined the equitable issues after the jury tried the legal issues. (*Bate* v. *Marsteller* (1965) 232 Cal.App.2d 605, 617 [43 Cal.Rptr. 149].)

With respect to the defense of the statute of limitations, a legal issue, Barbara had a right to a jury trial. (Cal. Const., art. I, § 16.) The trial court did not deny Barbara that right. However, after both sides had rested, it took the issue from the jury declaring that based on the evidence the questions presented were ones of law and not of fact. The court stated: "I am at this time stating that the special defenses of the statute of limitations and waiver are questions of law and not of fact. I am not going to present any special instructions to the jury on those special defenses. I am therefore refusing all instructions and special instructions, special verdicts on the subject matter of the statute of limitations and waiver." The trial court was correct.

The evidence pertaining to the applicability of the statute of limitations was not in conflict on the essential facts. ■ Where there is no conflict in the evidence upon which the determination of a question of law rests, the decision is for the court and it should not be submitted to the jury. (*Tschumy* v. *Brook's Market* (1943) 60 Cal.App.2d 158, 166 [140 P.2d 431]; *Adrian* v. *Guyette* (1936) 14 Cal.App.2d 493, 504 [58 P.2d 988].)

The record establishes without contradiction that after living together on an off-and-on basis from May 1964, Barbara and Jim parted company in July 1971. The jury found that the implied agreement between Barbara and Jim had two terms. The first was that "at all times thereafter" the parties would "live together as husband and wife, and in all ways conduct themselves in the manner of husband and wife, but would not legally marry." The second term was that "any asset or liability thereafter acquired or incurred by either party would be equally owned

by the two of them." Barbara testified that she left Jim in July 1971. She stated that she told him that she wanted "to get married, start a family." Jim didn't want to get married, he "wanted our relationship the way it was." She stopped seeing Jim after that. He tried to get her "to go back to him," promising to buy her an airplane if she would, but she refused. Barbara testified that she "was going to try and start over again." In about November 1971 Barbara met Mike Hefferon. They were married in March 1972. Barbara returned to Jim in November 1975, over four years after she left him.

Barbara contends that "primary questions of fact exist as to when Appellant's cause of action accrued, whether the statute of limitations was tolled by the fiduciary relationship existing between the parties, whether respondents are estopped from asserting the statute of limitations as a defense by the deceased's conduct, whether respondents were prejudiced by appellant's delay in commencing this action, and whether appellant's act of marrying Hefferon satisfies the requisite elements of waiver." None of these is a question of fact which should have been left to a jury. They are questions concerning the legal effect of the undisputed facts outlined above. The trial court did not err when it took the question of the applicability of the statute of limitations from the jury.

Finally Barbara contends that actually the uncontradicted facts compel a finding in her favor, claiming, inter alia, that her cause of action did not accrue until Jim's death.

Apparently the parties agree that the applicable limitation period is two years as provided in Code of Civil Procedure section 339, subdivision (1). ██ The question presented here is when did Barbara's cause of action on the implied contract accrue? The general rule is that a suit for breach of an implied agreement accrues at the time of the breach. (*Donahue* v. *United Artists Corp.* (1969) 2 Cal.App.3d 794, 802 [83 Cal.Rptr. 131].) When Barbara walked out on Jim in July 1971 to "start a new life," any cause of action she may have had to establish her right to one-half of the property accumulated by the parties during the period from May 1964 to July 1971 commenced at that time. Clearly the limitations period had run by the time she first asserted her claim in August 1978.

Barbara contends that the statute of limitations was tolled because there was a fiduciary relationship between them. Barbara relies on cases concerning the fiduciary relationship between husband and wife.

Barbara and Jim, of course, were not married during the period of time in question, and we know of no case which establishes a continuing fiduciary relationship between unmarried persons after the breakup of the arrangement. The *Marvin* case specifically refused to treat unmarried partners as putatively married, or extend to them the rights of an actual or a putative spouse under the Family Law Act. The court held only that a party to such a relationship had the same right to enforce a contract or to assert an "equitable interest in property acquired through her effort as does any other unmarried person." (*Marvin* v. *Marvin, supra*, 18 Cal.3d at p. 684, fn. 24.)

Barbara analogizes to the fiduciary relationship between business partners. Even assuming that the implied contract for the period 1964 to 1971 was in the nature of a partnership agreement, it is clear that Barbara abandoned the partnership in 1971, which was sufficient to start the running of the statute of limitations. (*Middleton* v. *Newport* (1936) 6 Cal.2d 57, 62 [56 P.2d 508].)

Barbara testified that the only property she knew that Jim had in 1971 was two corporation, A. V. Ready Mix, Inc. and Mojave Mill and Equipment Company. He had owned and run those companies before he met her in 1964 and he continued to exercise exclusive control over them after Barbara left him in 1971. Barbara testified that in 1971 when she left Jim she made no claim to a split of the property they had accumulated over the years from 1964. She testified that "I just didn't think about it. I told him I was going to start my life again."

Dissolution is defined as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." (Corp. Code, § 15029.) Assuming a relationship in the nature of a partnership, Barbara's abandonment constituted a dissolution of the partnership, and dissolution of a partnership commences the statute of limitations to run —including the four-year statute (Code Civ. Proc., § 343) applicable to an action for an accounting. (See *Middleton* v. *Newport, supra*, 6 Cal.2d 57; *Sibert* v. *Shaver* (1952) 111 Cal.App.2d 833, 841 [245 P.2d 514].)

Even in the case of an oral contract for services for an indefinite time period, the statute of limitations commences to run against a cause of action for payment when the services end. (See *Steiner* v. *Parker* (1959) 169 Cal.App.2d 22, 25 [336 P.2d 553]; *McManus* v. *Allan*

(1939) 32 Cal.App.2d 275, 281 [89 P.2d 690].) In *Demartini v. Katz* (1942) 49 Cal.App.2d 67 [120 P.2d 944], decedent lived in plaintiff's house from September 1, 1910, to June 1, 1914, and plaintiff rendered services to decedent during that time. About June 1, 1914, decedent ceased to live in plaintiff's home and plaintiff rendered no services to him from that date until he again came to live with plaintiff in June of 1919. He continued to live with plaintiff until his death on October 20, 1937, promising to leave by will an amount to compensate plaintiff for services rendered during that period. The appellate court stated (49 Cal.App.2d at p. 70): "There is no evidence of any promise made by decedent during the period from 1910 to 1914 to compensate plaintiff by will or at all for the services rendered during that period. It follows that as to any possible implied contract to pay for the services from 1910 to 1914 the statute commenced to run when the decedent left plaintiff's home on June 1, 1914."

Barbara contends that the estate is estopped to assert the statute of limitations because, when she and Jim got back together in 1975, he represented that property acquired pursuant to the implied agreement remained partnership property. Barbara's own uncontradicted testimony does not support this contention. Barbara testified that in November 1975, Jim said he wanted to take care of her "that the past didn't matter," and that "whatever was his was mine, 'consider it ours,' he said." She testified to no statement by Jim which would indicate that Jim was reaffirming or renewing the prior agreement they had regarding property acquired from 1964 to 1971. Furthermore, the jury specifically found that the express contract entered into by Jim and Barbara in November 1975 related only to property "thereafter acquired."

Finally Barbara's contention that the 1964-1971 contract and the 1975 contract are indivisible ignores the jury finding of two separate contracts and is not supported by the record.

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 15, 1981.