[Nos. B091294, B092813. Second Dist., Div. Four. July 15, 1997.]

PHILIP DE GUERE, Plaintiff and Appellant, v.
UNIVERSAL CITY STUDIOS, INC., Defendant and Respondent.

## COUNSEL

Fischbach, Perlstein, Lieberman & Yanny, Joseph A. Yanny, Mary L. Grieco, Samuel J. Lorowitz, Weinstein and Hart and Joseph F. Hart for Plaintiff and Appellant.

Katten, Muchin & Zavis, Gail Migdal Title and Todd Alberstone for Defendant and Respondent.

## OPINION

**EPSTEIN, Acting P. J.**—Philip De Guere appeals from a judgment entered in favor of Universal City Studios, Inc. (Universal) in his action for breach of contract, declaratory relief, and for an accounting. The parties are litigating Mr. De Guere's entitlement to profits from a television series which he created and produced. The trial court appointed a referee under the authority of Code of Civil Procedure section 639, subdivision (a),[1] which authorizes a reference for the examination of a long account. The principal issue on this appeal concerns the nondelegability of judicial power. We conclude that Mr. De Guere was deprived of his right to trial on the issues of contract interpretation and enforceability.

### FACTUAL AND PROCEDURAL SUMMARY

Mr. De Guere has been in the entertainment business since 1966. Most of his work was at Universal. In the summer of 1979, he created the *Simon & Simon* television series. He served as executive producer for the series pilots and for the first four seasons of production, from 1979 through 1984. Mr. De Guere did not work on the series after his contract with Universal expired in 1984.

Mr. De Guere's agent, Marvin Moss, represented him in negotiations with Universal with respect to the *Simon & Simon* series. (Mr. Moss died before commencement of this litigation.) Eventually, in 1981, the parties came to an agreement, which was memorialized in several documents: a term loanout contract (January 21, 1981); an exclusive term deal memo (January 21, 1981, as amended); and exhibits A, B, and C to the exclusive term deal

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated. Section 639 provides in pertinent part: "When the parties do not consent, the court may, upon the application of any party, . . . direct a reference in the following cases: [¶] (a) When the trial of an issue of fact requires the examination of a long account on either side; in which case the referees may be directed to hear and decide the whole issue, or report upon any specific question of fact involved therein."

memorandum. The most significant of these, for purposes of this case, is exhibit B, which governs net profit participation for the series subsidiary rights. It is on a preprinted form prepared by Universal.[2] The exhibit includes riders and an attachment labeled "Schedule 1," titled "Distribution Charges." It provides that Mr. De Guere is to receive 40 percent of the net profits derived from the series, calculated according to a formula set forth in the exhibit. "Net profits" was defined as "the gross receipts, if any, remaining after the deduction from gross receipts, in the following order, of (i) distribution fees on a continuing basis; (ii) distribution expenses; (iii) interest; and (iv) production costs." Production costs were to be calculated "according to the standard accounting practices now or hereafter employed by [Universal] for photoplays owned, financed, or distributed by a Producer Company." Mr. De Guere received more than $4 millon in episodic compensation, guarantees, and net profit advances attributable to his work on the series.

Distribution statements provided by Universal to Mr. De Guere showed that *Simon & Simon* generated no net profits. Instead, according to these statements, it produced a deficit of $58,932,075 through December 31, 1992. In 1992, Mr. De Guere brought an action against Universal for breach of contract, declaratory relief, and an accounting. The gravamen of the complaint is that Universal had not paid Mr. De Guere the net profits to which he was entitled, and that its failure to do so was the product of numerous improper accounting practices employed by Universal. Later he filed a first amended complaint, adding a cause of action for usury. Universal's demurrer to the usury cause of action was sustained with leave to amend. A second amended complaint, which is the charging pleading, alleged the original three causes of action and a revised cause of action for usury. The trial court found that the transaction was not within the scope of California usury law, and sustained Universal's demurrer to that cause of action without leave to amend.

Universal moved for appointment of a special accounting referee under section 639, subdivision (a). Mr. De Guere opposed the motion on the grounds that the law did not permit the referee to determine legal issues and that there would be a duplication of the efforts of the trial court and the referee. The trial court granted the motion. It appointed Elwood Lui, a retired judge, as referee to:

"1. Consider the issues raised by plaintiff's claims relating to the correctness of defendant's accountings to plaintiff and make [the word 'advisory'

---

[2]The agreement is between Universal and Astral Projections, Inc., Mr. De Guere's loanout corporation.

was stricken] findings on such issues which need to be resolved in order to render a correct accounting pursuant to the parties' agreement;

"2. Examine the SIMON & SIMON accounts which are relevant to plaintiff's claims;

"3. Perform an accounting to calculate the correct amounts reportable to plaintiff pursuant to the parties' agreement; and

"4. Submit to the Court a report containing the referee's [the word 'advisory' was again stricken] findings as to the aforementioned issues and recommendations as to the proper accounting to be rendered to plaintiff."

In a conference with counsel, the referee suggested that the parties first address contract interpretation issues because the resolution of those issues would determine whether an in-depth accounting was needed.

At a referee-conducted hearing in June 1994, Mr. De Guere presented the testimony of his expert witness, certified public accountant Philip J. Hacker. Mr. Hacker explained his firm's findings based on an audit of Universal's distribution statements made to Mr. De Guere. According to this audit, Universal overstated production and distribution costs, and understated revenues, which led to the negative return for the series. Mr. Hacker concluded that the production costs had been overstated by $18,413,449 and that distribution costs were overstated by $3,567,393 plus an amount which could not be determined because Universal had provided insufficient data in support of its accounting calculations. The audit concluded that interest on production costs had been overstated by $56,858,478. The total of these items is $78,839,320 plus undetermined amounts. If these calculations were correct, *Simon & Simon* should have shown a net profit of as much as $109,980,780, to which Mr. De Guere had a claim of 40 percent, or $43,992,312.

While Mr. Hacker conceded that the accounting methodology utilized by Universal in calculating net profits was substantially similar to that used by other major studios, he concluded that these practices did not constitute custom and practice evidence because they were not codified in any way. Mr. Hacker explained that he had requested, but had not received, a copy of the written accounting practices used at Universal.

Zane J. Lubin, Mr. De Guere's business manager, testified that during the negotiation of the agreement he had discussed the net profit provision with Mr. Moss. At the time, Mr. Moss told Mr. Lubin that Universal would not

negotiate the terms of the net profit formula. Mr. Lubin assumed that there would be net profits from *Simon & Simon* once more than 90 episodes were produced and the series was syndicated.

Mr. De Guere testified that he had no personal role in the negotiation of the agreement with Universal, but that Mr. Moss had kept him informed. He had no previous awareness of how Universal accounted for net profits, but thought that net profits represented money that was over and above costs involved in the production and distribution of the series.

Universal presented all of its evidence by way of declaration. Jerry Gottlieb, vice-president of business affairs at Universal Television from 1980 to 1982, negotiated the agreement with Mr. De Guere on behalf of Universal. He said that Mr. De Guere's agent, Mr. Moss, had represented talent in many deals with Universal, and that his negotiation of advances against net profits established his knowledge of the studio's net profit practices. Mr. Gottlieb described the standard order of recoupment from gross revenues used by Universal in calculating net profits. It was to subtract the following, in order: 1) distribution fees; 2) distribution expenses; 3) interest on unrecouped production costs; and 4) unrecouped production costs. Mr. Gottlieb also described Universal's standard practices in calculating distribution expenses, production costs, interest and overhead. These practices were substantially similar to those used by the other major studios at the time.

Arnold Shane was vice-president of business affairs at Universal when the agreement was negotiated. He participated in the negotiation of the net profit percentage aspects of the agreement with Mr. De Guere. He echoed Mr. Gottlieb's declaration as to Mr. Moss's experience as an agent, Universal's standard accounting practices, and the substantial similarity of those practices to those used by the other major studios at the time.

Howard Barton, who was head of television legal affairs for Paramount from 1967 through 1992, testified that net profit accounting practices were substantially the same throughout the industry. In his view, in the early 1980's, many agents calculated an amount they believed represented their clients' net profit participation and negotiated advances to represent this amount. He noted that Mr. De Guere's agreement was exceptional because he received these advances before the series was syndicated.

Mel Sattler, a 47-year veteran of the motion picture industry, was vice-president and executive in charge of the business affairs department of Universal Pictures for Feature Motion Pictures—World-Wide, with ultimate

responsibility for every deal the studio made in that area. Mr. Sattler had known Mr. Moss for 20 years, and had negotiated many deals with him, including several that included "net profit" provisions. He said that Mr. Moss understood that the order of recoupment used in calculating net profits was standard throughout the industry. Mr. Sattler provided a detailed history of contingent compensation in the entertainment industry from the early 1950's. He also explained the economic pressures on the studios which led to the standard methods of accounting for net profits. Mr. Sattler also referred to several articles and seminars, published and given before the 1981 contract in this case, in which industry net profit accounting practices were discussed.

At the conclusion of the hearing, the referee indicated his interest in the accounting customs and practices of the entertainment industry. He inquired whether Universal intended to present further evidence of industry practice relating to the specific accounting issues raised in the hearing. Counsel for Universal replied that she did not plan to do so, but "[t]o the extent that there have been specific practices that have been raised such as reimbursements from the network and how those are treated—if that becomes relevant, depending on how you look at the larger money issues, then obviously I'd like to have an opportunity to present testimony. But it may not be necessary."

Counsel for Universal said that she had understood that the hearing would be limited to the major items. The referee said that he had enough evidence to assess and evaluate the major issues: interest charged and methodology; production and distribution fees; and mechanisms of accounting pursuant to the contract. The referee proposed to issue a tentative report, so that the parties would be able to augment the evidence if necessary. The referee said that if his tentative report created issues which were not covered at the hearing, the proceeding could be reopened to resolve them.

On September 12, 1994, the referee issued a 36-page report. Besides the evidence presented at the hearing, he also read and considered Mr. De Guere's two-volume deposition with exhibits; the four-volume deposition of Philip J. Hacker; and the two-volume deposition of Elaine Douglas, who had prepared the audit for Mr. Hacker's firm. The referee began by stating that the vast difference in the parties' net profit figures was principally due to different treatment of four critical accounting issues arising out of the net profit definition and calculation:

"*Accounting Issue Number One*: the order in which the distribution fees, distribution expenses, interest and production costs should be recouped;

"*Accounting Issue Number Two*: whether Universal should charge standard charges or the actual ('out-of-pocket') incremental costs for use of its facilities, equipment, and personnel fringe benefits in producing the series;

"*Accounting Issue Number Three*: whether the interest due Universal is calculated in the appropriate manner and whether proceeds should be applied to principal before interest; and

"*Accounting Issue Number Four*: whether certain receipts from certain distributions should be treated as receipts subject to a distribution fee or as offsets to expenses not subject to such fees."

The referee concluded that Universal's methodology on these four accounting issues "is proper in that it is within the custom and practice of the industry and is not inconsistent with the language of the parties' agreement." The referee next dealt with Mr. De Guere's evidentiary objections to the declarations submitted by Universal. He ruled that each declarant had provided a sufficient foundation to provide testimony on industry custom and practice. He rejected Mr. De Guere's objection that these declarations were irrelevant because the agreement does not explicitly make industry custom and practice a part of the deal.

A major part of the referee's report is devoted to issues of contract interpretation. Mr. De Guere argued that certain essential terms of the agreement are vague and ambiguous, and therefore must be construed against Universal, which had drafted the documents. Mr. De Guere also contended that the agreement is a contract of adhesion, and, as such, is not enforceable. Universal responded that there was no ambiguity, or alternatively, the referee could use industry custom and practice to interpret any ambiguous terms. Universal argued that although Mr. De Guere only skimmed the agreement, he had relied on Mr. Moss, his experienced and knowledgeable agent, for negotiation of the contract. Finally Universal took the position that its accounting practices were the same as those employed in the television industry by most major studios.

The referee found that the agreement is not a contract of adhesion. He ruled that Mr. De Guere is bound by its terms, whether he had read them or not. The referee rejected Mr. De Guere's argument that ambiguities in the agreement were to be interpreted against the drafter, Universal, because the ambiguities could be resolved by reference to industry custom and practice, and that Universal had presented credible evidence of such practice on each of the major accounting issues.

The referee next reviewed Mr. Hacker's reconciliation of the audit claims. The referee subtracted from Mr. Hacker's calculations the claimed items

which the referee had rejected because he found evidentiary support for Universal's accounting. The result was that if Mr. De Guere prevailed on the remaining amounts he claimed, the net loss for the series would be reduced by just under $11 million, leaving a net loss of at least $48 million through the end of 1992. Under these circumstances, the referee concluded, an accounting was not required because a net profit would not be shown.

The referee made the following recommended findings:

"1. The Universal profit participation statements for the Simon & Simon series utilizes proper methodology for: (1) the order of recoupment of production costs for purposes of calculating interest; (2) utilizing standard rates for facilities and equipment internal charges; and (3) classification of receipts from distributors as 'gross receipts' under the January 21, 1981 agreement.

"2. The Universal profit participation statements for the Simon & Simon series calculate interest properly pursuant to the January 21, 1981 agreement and is not usurious.

"3. The maximum adjustment of the Universal profit participation statements for the Simon & Simon series as of December 31, 1994 does not exceed approximately $11 million dollars and potentially can be reduced significantly below that amount.

"4. The Simon & Simon series shows a substantial net loss through December 31, 1992 amounting to at least $48 million dollars. An accounting should not be ordered by the Court until such time that a showing can be made that such an accounting will result in a reasonable likelihood that a profit participation distribution will be due DeGuere."

On September 29, 1994, the referee filed a supplemental report regarding two claims that had been withdrawn by Mr. De Guere at the June 1994 hearing. These adjustments changed the unresolved audit claims to $10,350,738. On October 25, 1994, the trial court issued a minute order: "The Court has read and considered the report of the Referee Elwood Lui, and is in agreement with the recommendations and findings contained therein. If any Order other than the above is considered necessary by the Defendant, Defendant is ordered to prepare, serve, and file a proposed Order within 15 days of this date."

On November 2, 1994, Mr. De Guere filed a motion for reconsideration of the October 25, 1994, order. He argued that the referee's report should not

be adopted because the referee decided legal rather than accounting issues, and that in doing so he had exceeded his authority, depriving Mr. De Guere of his right to jury trial. Mr. De Guere also argued that the referee erred in concluding the agreement was not a contract of adhesion, in ruling on the evidentiary objections, in making findings unsupported by the evidence, and in failing to provide the trial court with an adequate record for review. Universal filed a reply and lodged the deposition transcripts of Elaine Douglas, Philip J. Hacker, Mr. De Guere, and each party's evidentiary briefs. Universal also filed an opposition to Mr. De Guere's motion. The record on appeal does not indicate that a hearing was held on the motion.

On December 28, 1994, the trial court issued a minute order and signed and filed an order prepared by Universal. The minute order stated that the court had reconsidered the order of October 25, 1994, and reconfirmed it. The court observed that it believed the motion for reconsideration was untimely, but nevertheless, had considered it on its merits. The minute order concluded: "In making the above Order, the Court has considered the argument of Counsel and has read and considered the Report of the Referee, Plaintiff's instant Motion and Attachments, Defendant's Opposition to the instant Motion, Exhibit 'B' to Plaintiff's Brief to Referee on Contract Interpretation Issues signed April 29, 1994, and Defendant's Reply to Plaintiff's Objections and Comments to the Declarations submitted by Defendant in Support of Net Profit Definition signed June 29, 1994."

The trial court edited one aspect of the proposed order prepared by Universal. The proposed order stated that "after full consideration of the *evidence and points and authorities submitted by the parties and the argument of counsel* and for the reasons set forth in the Referee's Reports attached hereto as Exhibit A, and good cause appearing; . . ." The trial court deleted the italicized language and substituted "matter." The trial court added that the order was based on the reasons set forth in the court's minute order of December 28, 1994, as well as the referee's reports.

The trial court rejected Mr. De Guere's claims and ruled that Universal correctly and properly accounted pursuant to the agreement as follows: (1) in the calculation of interest charged to the series, including the order of recoupment, charging interest on production costs, including those charged at standard rates, and in using a 360-day year; (2) in charging standard rates, rather than actual cost, for production costs; (3) in charging certain items directly and including other items in the standard charge for indirect costs; and (4) in accounting for gross receipts, and in subjecting certain gross receipts to distribution fees.

The order also included the following conclusions of law regarding the applicable principles of contract interpretation:

"a. Plaintiff is bound by the terms of the Agreement whether he read the Agreement or not, and is chargeable with and bound by the knowledge of or notice to his agent Marvin Moss.

"b. The Agreement is not an adhesion contract, because there were negotiated changes to Universal's standard form contract. Plaintiff was free to negotiate with other major studios and was not forced to contract only with Universal. Furthermore, Universal's accounting under the Agreement is consistent with the parties' reasonable expectations and the Agreement is not oppressive or unconscionable because it is not overly harsh or one-sided.

"c. A contract, even an adhesion contract, is not interpreted against the party causing the uncertainty unless established rules of interpretation are unsuccessful in removing the uncertainty. Established rules of contract construction include industry custom and practice and common usage of the terms, which are not required to be in writing or specifically referenced in the Agreement.

"d. Industry custom and practice and the practices of Universal's competitors, which are consistent with Universal's accounting, are relevant to explain the intention of the parties and the meaning of the terms of the Agreement."

The trial court concluded that the issues submitted by the parties were those which could have a material impact on the calculation of net profits for the series, and even if Mr. De Guere prevailed on all the remaining claims, the series would not be shown to have realized net profits. Mr. De Guere's remaining claims were dismissed without prejudice. Judgment in favor of Universal was entered, and Mr. De Guere was ordered to pay Universal's costs of suit.

Mr. De Guere separately appealed from the order and minute order of December 28, 1994 (B091294) and from the judgment (B092813). By stipulation of the parties, the two appeals were consolidated.

DISCUSSION

I

We first address the appropriate scope of a reference for a long account pursuant to section 639, subdivision (a). Mr. De Guere argues that the trial court's order appointing the referee improperly purported to delegate decisionmaking authority on legal issues in violation of the statutes governing

such references, that the referee exceeded his authority in deciding those issues, that, because of this, the report was void and therefore could not be adopted by the trial court, and that the trial court did not conduct an independent review before adopting the referee's report. We begin our review of these arguments with an examination of several principles governing references.

## A. General Principles

The starting point in any discussion of the reference power is the constitutional prohibition against delegation of judicial power. The California Constitution, article VI, section 22, prohibits the delegation of judicial power except for the performance of subordinate judicial duties: "The Legislature may provide for the appointment by trial courts of record of officers such as commissioners to perform subordinate judicial duties." (See *Aetna Life Ins. Co.* v. *Superior Court* (1986) 182 Cal.App.3d 431, 436 [227 Cal.Rptr. 460] ["Deciding a major legal issue in a case, which probably will determine liability, is not a subordinate judicial duty."].) This basic constitutional limitation, barring courts from delegating power, is at the heart of this case.

There are two kinds of references authorized by statute: general and special. Section 638 provides for a reference by agreement of the parties: "1. To try any or all of the issues in an action or proceeding, whether of fact or of law, and to report a statement of decision thereon; [¶] 2. To ascertain a fact necessary to enable the court to determine an action or proceeding." Since Mr. De Guere opposed the appointment of a referee, the appointment could not, and was not, made pursuant to section 638.

The Legislature has authorized special references only in limited circumstances. The pertinent provision of section 639 bears repeating. "When the parties do not consent, the court may, upon the application of any party, . . . direct a reference in the following cases: [¶] (a) When the trial of an issue of fact requires the examination of a long account on either side; in which case the referees may be directed to hear and decide the whole issue, or report upon any specific question of fact involved therein."[3] Under California Rules of Court, rule 244.2(a), an order of reference under section 639 must specify: "[T]he reasons for the reference, the scope of the reference, and any conditions on the reference, including any limitation on the referee's total fees or hourly fee as well as the terms of the obligation of each party to pay the referee."

The reference in this case, as in any other where the parties have not agreed, is guided by the constitutional limitation on delegation of judicial

---

[3]Prior to amendments enacted in 1981 (Stats. 1981, ch. 299, § 1, pp. 1429-1430), the subdivisions of section 639 were designated by number rather than by letter.

power. It is not surprising a tension exists between the constitutional provision and section 639.

Both general and special references in California predate the adoption of the Code of Civil Procedure in 1872. The Supreme Court discussed the limits of a trial court's power to order a reference over a party's objection in an early case, *Williams* v. *Benton* (1864) 24 Cal. 424. In that case, the Supreme Court examined the predecessor of the current statutory scheme, section 183 of the Practice Act. Subdivision 1 of that statute provided for appointment of a referee " 'when the trial of an issue of fact requires the examination of a long account on either side—in which case the referee may be directed to hear and decide the whole issue, or report upon any specific question of fact involved therein.' " (24 Cal. at p. 425.)

The language of the current statute is identical to the language of the statute construed in *Williams*. The *Williams* court construed the meaning of the phrase "decide the whole issue": "The word 'issue' is used twice, and each time in the singular number, and no other issue is mentioned than such as requires the examination of a long account, and no power is given the Court to direct the referee to report a judgment. If there be but one issue in the action, and that issue involves the examination of a long account, the whole case may be sent to a referee; but, even in such a case, he cannot be invested with power to report a judgment. *If, however, there are other issues in the case, not involving the examination of a long account, the Court has no compulsory power to send them to a referee for trial.*" (24 Cal. at p. 425, italics added.)

The Supreme Court contrasted the power of the court to appoint a referee to examine a long account with the power to make a general reference under the predecessor statute to section 638: "Taking the two sections together, it is clear that it was not the intention of the Legislature to confer compulsory power upon the Court over the question of reference beyond such issues as involve the examination of a long account. Under the Constitution, this section cannot be construed to include issues of that character even in cases in which the parties have a constitutional right to a trial by jury." (*Williams* v. *Benton, supra,* 24 Cal. at p. 426.) The court reversed the judgment and ruled that the trial court had no power to refer the other issues in the case. (*Id.* at pp. 426-427.)

A referee's limited authority to examine a long account was examined again in *Fredenhall* v. *Shrader* (1920) 45 Cal.App. 719 [188 P. 580]. In that case, prior to the trial of an action to determine the rights of various parties to shares of stock and receipts for sale of oil, the trial court appointed a

referee for the taking of an account. The order of reference was based in part on section 638, governing references by consent of the parties, and in part on section 639, former subdivision (1), for an accounting. The *Fredenhall* court explained the difference between the powers conferred by these statutes. Under section 638, by reason of the parties' agreement, the referee is vested with power to try *"any and all issues, whether of law or of fact,* in the action or proceeding in which the order of reference is made, . . ." (45 Cal.App. at p. 723, italics added.) The court continued: "There is, then, an important distinction between the power which may be exercised by a referee to whom a reference is made by agreement of the parties (section 638), and the power of the referee to whom a reference is made under section 639, in this: That, while under the first-mentioned section the referee may be directed and so authorized to report findings *and judgment* upon all the issues in the case, in the last-named section his power is restricted to the hearing and *decision* (or the finding) of the *facts as to the account ordered by him to be examined."* (*Ibid.,* italics added; see also *In re Edgar M.* (1975) 14 Cal.3d 727, 734 [122 Cal.Rptr. 574, 537 P.2d 406] ["Without the parties' consent there can be a reference of particular issues, but apart from the special instance of 'the examination of a long account' [citations] the referee's determinations in a compulsory reference are not binding until adopted by the court itself."]; *Marathon Nat. Bank* v. *Superior Court* (1993) 19 Cal.App.4th 1256, 1261 [24 Cal.Rptr.2d 40] [trial court must review report of discovery referee appointed under section 639, subdivision (e)].)

The limits of a special reference under section 639 were examined again in *Badgley* v. *Van Upp* (1993) 20 Cal.App.4th 218 [24 Cal.Rptr.2d 406]. The case arose out of several suits by a tenant in common of residential property, brought against his cotenant, seeking an accounting and receivership, injunctive relief, and damages for waste and conversion. The actions were consolidated and the trial court referred the action to a court commissioner for the taking of "all evidence." The commissioner heard the evidence, which was then turned over to the trial court, which rendered a statement of decision and a judgment in favor of the plaintiff.

The Court of Appeal reviewed the statutory bases for appointment of commissioners, referees, and temporary judges, and concluded that the reference to the commissioner was unauthorized, requiring a remand to the trial court. The *Badgley* court ruled that the reference could not be construed as a special reference under section 639 because that statute does not allow referral of " 'all the issues involved in the action' " as the trial court had directed in that case. (20 Cal.App.4th at p. 225, quoting *Williams* v. *Benton, supra,* 24 Cal. 424, 426.)

In this case, we do not deal with, and do not decide, issues regarding other subdivisions of section 639; our analysis is confined to subdivision (a).

While the provision is one of some antiquity, none of the reported cases discuss the rationale for the accounting reference. But we believe it is clear enough. ■ The reference is allowed because a trained accountant is generally better able to efficiently and inexpensively examine a "long account" than a trial court judge is able to do through adversarial court proceedings. The tension in this area is over how much latitude the accountant referee may exercise in making factual determinations. It does not matter that a particular referee has legal training. The scope of the reference is set by the constitutional limitations on delegation of judicial power to a referee.

To do a proper examination of a long account, a referee needs to know two things—each of which is within the proper ambit of his or her authority. First, the referee must know the proper accounting methodology to be applied. Second, the referee must have the accounting records at issue. The parties must obtain the necessary records through discovery to enable the referee to perform the examination.

As to the first, we expect that in the ordinary case the referee will look to established and accepted standards of accounting principles, such as those prepared by the American Institute of Certified Public Accountants.[4] But in particular industries, other standards may apply. In such cases, the referee must look to industry custom and practice.

The language of section 639, subdivision (a) cannot constitutionally be interpreted to allow a referee to make broader determinations, such as the intent of the parties, or whether their agreement is a contract of adhesion.

Problems also arise when there are ambiguities in the contract that are not amenable to resolution by application of generally accepted accounting principles.

Broadly speaking, there are three ways to deal with that problem. The trier of fact may resolve the factual and legal issues before making the reference; the referee may petition for instructions when such issues of contract interpretation and enforceability arise; or the referee may make findings based on each of the limited possible interpretations of the contract advanced by the parties, leaving it for the trier of fact to determine which interpretation should be adopted.

We endorse the procedure employed by the trial court in *Huntoon v. Hurley* (1955) 137 Cal.App.2d 33 [290 P.2d 14]. In that case, an employee

---

[4]For a discussion of these standards, see *Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 381-383 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835].

sued his employer to enforce a written contract which provided that the plaintiff was to receive a share of net profits, calculated by a firm of independent certified public accountants on the basis of generally accepted accounting principles. Plaintiff's actions on the employer's note securing his net profit share and for an accounting were consolidated for trial. Pursuant to stipulation, the trial court first addressed the employer's contention that the written agreement had been modified, and concluded that it had not. The court then appointed a referee to take an accounting pursuant to the terms of the original agreement. (*Id.* at pp. 35-36.)

We think this is an appropriate procedure to employ where an accounting is necessary, but there is a dispute about the terms, or enforceability of the written agreement at issue. Following this approach, issues of contract interpretation are resolved first, and that resolution guides the referee who examines the account. We recognize, however, that this may not be the preferable approach in all cases, and that the particular approach selected is a matter of trial court discretion so long as it conforms to the constitutional principle of nondelegability of judicial functions.

We turn now to Mr. De Guere's arguments.

B. *Reference Order*

 Mr. De Guere argues that the order appointing the referee constituted an unauthorized delegation of judicial power. The order directed the referee to "make findings on such issues which need to be resolved in order to render a correct accounting pursuant to the parties' agreement," as well as to perform an accounting and to report on the findings. To a degree, the language of the order tracks the language of section 639, subdivision (a), which authorizes the referee to decide "the whole issue." But the statutory authorization only extends to "examination of a long account."

The order also specifies the sort of tasks the referee is to perform. In this, it complies with California Rules of Court, rule 244.2(a). Pursuant to this order, the referee set out to do an accounting and to resolve further matters he believed necessary to perform his duty. The problem is that the assignment brought the referee into conflict with the constitutional limitations on delegation of judicial power.

C. *Scope of Referee's Authority*

The proper scope of a referee's authority under section 639, subdivision (a) must be defined in a way that comports with both the constitutional

limitation on delegation of judicial power and the constitutional right to jury trial. We now address the former, reserving our examination of the right to jury trial for later in the discussion.

Mr. De Guere argues that the referee exceeded his authority by ruling on (1) whether the contract was unconscionable; (2) whether it was a contract of adhesion; (3) whether the contract was enforceable; and (4) the proper interpretation of the contract as a matter of law. Universal takes the position that the referee was authorized to interpret the contract in order to perform the accounting, but cites no authority to support the argument.

Our review of the referee's 36-page report reveals no specific findings on the unconscionability of the contract. But the referee did make findings on three issues of contract enforceability: that Mr. De Guere is bound by the terms of the contract although he had not read it; that Mr. Moss acted as Mr. De Guere's agent in negotiating the agreement and had the power to bind his client; and that the agreement was not a contract of adhesion.

These findings exceeded the limited scope of a reference authorized by section 639, subdivision (a). Issues of contract interpretation are questions of law for the trial court, but not for the referee to decide. ■ "The interpretation of a written instrument, even though it involves what might properly be called questions of fact [citation], is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. [Citations.] Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.] It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

■ Similarly, the referee exceeded the scope of the reference by deciding issues of contract enforceability, such as whether the agreement was a contract of adhesion. The question of whether a particular contract is one of adhesion and, if so, whether it is enforceable, are equitable issues to be resolved by the trial court, but not by the referee. (See *Westlye* v. *Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1735-1737 [22 Cal.Rptr.2d 781].) The determination that Mr. De Guere was bound by the contract even though he had not personally read it was a legal issue beyond the scope of the referee's authority to decide. But the point is so elementary and beyond dispute, that no harm can be predicated upon the referee's conclusion. The

same is not true of the other questions of contract enforceability, as we shall discuss. What, then, are the issues a referee is to decide in examining a long account? They are, simply, those technical accounting matters necessary to carrying out the task.

The agreement between Universal and Mr. De Guere specified that production costs were to be calculated according to Universal's standard accounting practices. There was no evidence that Universal failed to employ its standard accounting practices in calculating the profit statements for *Simon & Simon.* Nor was there any substantial conflict in the evidence presented to the referee on the applicable custom and practice in the television industry. As we shall discuss, Universal presented ample evidence of these practices, and Mr. De Guere's expert conceded that they were those of the industry at the time.

The second step of the referee's examination presents a more difficult problem. In the ordinary case, we assume the referee will be presented with the accounts maintained by the parties, or at least one of the parties, and the referee will examine those accounts, applying the accepted accounting standards.

But here, Universal presented no figures regarding the accounts it kept on *Simon & Simon.* Mr. De Guere, through his accounting expert, Mr. Hacker, presented the summary statements received from Universal, and some raw data provided by Universal for the audit conducted by Mr. Hacker's firm. Nevertheless, there was no significant challenge to these numbers. Mr. De Guere did not and does not argue that the figures Universal provided to Mr. Hacker were incorrect. While Mr. Hacker noted that he was unable to audit certain items because supporting figures were not provided by Universal, nothing was made of this before the referee, at the trial court, or on appeal. We are not told what efforts Mr. De Guere made through discovery to obtain the missing data. Thus, on the record before us, there is nothing to challenge the basic numbers provided to the referee.

There were areas of significant conflict, however, regarding the methodology used by Universal, for example, in calculating the costs of production. The referee pointed out that even if each of these issues was resolved in Mr. De Guere's favor, there would be no profit, and therefore it was not necessary to perform a full accounting.

Mr. De Guere challenges the accounting practices employed by Universal. It comes down to three questions. First, is it competent for the referee under section 639, subdivision (a) to make a determination of the proper accounting methodology to be applied? The answer is yes. If a referee is examining

a long account, the referee must know the accepted standards that guide the examination. The referee's decisions on these accounting issues are, like any others, subject to judicial oversight. But they are matters for the referee to determine in the first instance. As we have discussed, in the ordinary case, standard accounting principles and practices will be employed. But in some circumstances, the custom and practice of a particular industry may apply. We conclude that the referee may properly make a determination of which accounting standards to apply, even if there is a conflict in the evidence as to the proper standard.

The second question is whether the referee's decision on the appropriate accounting standards is subject to judicial review. It is. This principle is consistent with established rules regarding the interpretation of contracts, which reserves that issue for the trial court, unless conflicting extrinsic evidence is presented. (See *Parsons* v. *Bristol Development Co.*, *supra*, 62 Cal.2d at p. 865; *Equitable Life Assurance Society* v. *Berry* (1989) 212 Cal.App.3d 832, 836, 838 [260 Cal.Rptr. 819].)

We have reviewed the record of the hearing before the referee, including the declarations submitted by Universal, and find no conflicting extrinsic evidence. As the referee observed, the parties took very different approaches in the presentation of their cases. Mr. De Guere's evidence concentrated on specific accounting practices reviewed in Mr. Hacker's audit, on Universal's unwillingness to negotiate the terms of the net profit agreement, and on Mr. De Guere's limited role in negotiating the contract and vague understanding of the concept of net profits. In contrast, Universal presented no evidence on the specific claims discussed by Mr. Hacker. Instead, its declarations were designed to demonstrate two major points: that Universal's calculation of net profits was substantially the same as that used by all major studios, and that Mr. De Guere's agent, Mr. Moss, was familiar with those practices and took them into account in negotiating substantial advances for his client.

At one point in his testimony, Mr. Hacker explained the recoupment order which he believed Universal should have employed, and indicated that the MTM studio had used the kind of recoupment order he was suggesting. Based on that evidence, Mr. Hacker concluded that the method used by Universal was not accepted throughout the industry. But when counsel for Universal produced the net profit agreement used by MTM at the time Mr. De Guere's contract was negotiated, Mr. Hacker conceded that its methodology was substantially the same and did, in fact, reflect the custom and practice of the industry. The result is that there is no material conflict in the evidence presented to the referee. In the absence of such conflict, it was for the trial court, but not the referee, to interpret the contract as a question of law. (See *Parsons* v. *Bristol Development Co.*, *supra*, 62 Cal.2d at p. 865.)

The third question raised is whether Mr. De Guere was entitled to a jury trial. We discuss that question in the next section, and in part II of this opinion.

### D. *Other Issues*

We turn to additional problems with the referee's order and the trial court's findings. The referee found that the agreement is not usurious because interest was properly calculated under the contract documents. Such a finding is puzzling in light of the trial court's order sustaining Universal's demurrer to the usury cause of action without leave to amend, an issue we address later in this opinion. Moreover, the referee was not authorized to make it. "Once the historical facts of the transaction are determined, the question of whether *that type of transaction* is subject to the usury proscription is a question of law." (*Ghirardo* v. *Antonioli* (1994) 8 Cal.4th 791, 800 [35 Cal.Rptr.2d 418, 883 P.2d 960], original italics.)

In opposing Mr. De Guere's claim that the agreement is an unenforceable adhesion contract, Universal argued that the agreement was enforceable because it was within the reasonable expectations of the parties, and that it was not unduly oppressive or unconscionable. The referee had made no finding on the reasonable expectations of the parties, or on whether the agreement is oppressive or unconscionable.[5] As we have discussed, these issues were beyond the scope of a reference under section 639, subdivision (a).

Nevertheless, without trial, argument or evidence, the trial court signed a proposed finding prepared by Universal that stated: "Furthermore, Universal's accounting under the Agreement is consistent with the parties' reasonable expectations and the Agreement is not oppressive or unconscionable because it is not overly harsh or one-sided." It appears that Universal simply helped itself to this finding by including it in the order it prepared for the trial court.

### E. *Review and Adoption of Findings by Trial Court*

Building on his argument that the referee exceeded his authority, Mr. De Guere argues the referee's findings are void, and that therefore the trial court could not adopt them as its judgment. He also argues that the trial court failed to independently consider the referee's findings.

---

[5]Unconscionability is a question of law for the court. (*Vance* v. *Villa Park Mobilehome Estates* (1995) 36 Cal.App.4th 698, 709 [42 Cal.Rptr.2d 723]; *Patterson* v. *ITT Consumer Financial Corp.* (1993) 14 Cal.App.4th 1659, 1663 [18 Cal.Rptr.2d 563].

The trial court was required to decide the contract interpretation and enforceability issues. As we have seen, the trial court was not entitled to refer any matter beyond examination of a long account to the referee, unless the parties agreed, and they did not. The referee's findings on matters such as contract interpretation and enforceability were beyond the scope of a reference under section 639, subdivision (a). The parties presented briefing and evidence on these issues to the referee. The transcript and exhibits of the proceeding before the referee, and the briefs, were then submitted to the trial court. We presume that the trial court read and considered this material.

Nevertheless, the proceedings before the trial court were confused. In his motion for reconsideration, Mr. De Guere asserted his right to a trial court determination of all legal issues. Yet the trial court never set a hearing on the review of the referee's report. We find no waiver or forfeiture by Mr. De Guere of his right to present extrinsic evidence to the trial court on the issues of contract interpretation and enforcement. Because the referee was not authorized to interpret the contract, the fact that the parties had an opportunity to present evidence to him on issues of interpretation and enforceability is beside the point.

Since the parties were entitled to a trial, but there was none, nor a waiver of the right to trial, the trial court could not properly base its judgment on the findings of the referee. Doing so amounted to an unconstitutional delegation of judicial power. Moreover, Mr. De Guere may have been deprived of his right to jury trial, an issue we discuss in part II of this opinion.

On remand, issues relating to the interpretation and enforceability of the agreement must be decided at trial, with full opportunity for argument by counsel and the presentation of additional evidence if necessary to the resolution of factual issues. If the parties present conflicting extrinsic evidence regarding the interpretation of the contract on remand, the credibility issues must be resolved by a jury, if a jury is properly demanded. (*Parsons* v. *Bristol Development Co., supra,* 62 Cal.2d at p. 865; see also *Horsemen's Benevolent & Protective Assn.* v. *Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1560 [6 Cal.Rptr.2d 698] [jury must determine conflicting facts regarding disputed interpretation of contract]; *Southern Christian Leadership Conference* v. *Al Malaikah Auditorium Co.* (1991) 230 Cal.App.3d 207, 220 [281 Cal.Rptr. 216] [conflicting extrinsic evidence on contract interpretation is for trier of fact to resolve]; *Medical Operations Management, Inc.* v. *National Health Laboratories, Inc.* (1986) 176 Cal.App.3d 886, 892, fn. 4 [222 Cal.Rptr. 455] ["[H]ad the evidence itself been in conflict, we suspect a procedure more in keeping with the rationale of *Parsons* would be for the trial court to require the jury to make special findings on the disputed issues

and then base its interpretation of the contract on those findings."]; *Estate of Casey* (1982) 128 Cal.App.3d 867, 871 [198 Cal.Rptr. 170] [jury is to resolve factual dispute on interpretation of will, trial court is to interpret testator's intent from those facts].) If the question of contract interpretation does not turn upon the credibility of conflicting extrinsic evidence, then the trial court must resolve the issues. Equitable defenses are to be determined by the trial court rather than a jury. (See *Estate of Fincher* (1981) 119 Cal.App.3d 343, 351 [174 Cal.Rptr. 18].)

II

Mr. De Guere argues that his right to due process was violated because he was deprived of his right to jury trial, to cross-examine Universal's witnesses, and to present a rebuttal case. Although a jury trial is required by due process of law in certain California civil proceedings (see *County of El Dorado* v. *Schneider* (1987) 191 Cal.App.3d 1263, 1281 [237 Cal.Rptr. 51]), a civil action for breach of contract does not implicate the fundamental interests necessary for due process analysis to apply.[6] We turn to an analysis of the constitutional right to jury trial.

In arguing violation of his right to jury trial, Mr. De Guere relies on both the federal and state Constitutions. The former does not aid him. "The Seventh Amendment to the United States Constitution, which guarantees a federal right to jury trial in civil cases, is not binding on the states. [Citation.] Therefore, we confine our analysis to the California Constitution. The right to jury trial is secured by article I, section 16 of the California Constitution. 'Trial by jury is an inviolate right and shall be secured to all, . . .' [¶] In California, the constitutional right to jury trial in civil cases is coextensive with the right as it existed under the common law of England in 1850, when the California Constitution was adopted. [Citation.]" (*Hung* v. *Wang* (1992) 8 Cal.App.4th 908, 927 [11 Cal.Rptr.2d 113].)

---

[6]"All of the cases in which a right to a jury trial has been found by the California Supreme Court to be mandated by the state due process clause have involved the fundamental interests of a person's dignity and liberty. (See, e.g., *People* v. *Smith* [(1971)] 5 Cal.3d [313,] 317 [96 Cal.Rptr. 13, 486 P.2d 1213] [due process requires jury trial in proceedings to extend commitment to California Youth Authority]; *In re Gary W.* [(1971)] 5 Cal.3d [296,] 307 [96 Cal.Rptr. 1, 486 P.2d 1201] [same]; *Conservatorship of Roulet* [(1979)] 23 Cal.3d [219,] 235 [152 Cal.Rptr. 424, 590 P.2d 1] [due process requires unanimous jury verdict in 'gravely disabled' civil commitment conservatorship proceedings under Lanterman-Petris-Short Act]; see also *People* v. *Burnick* [(1975)] 14 Cal.3d [306,] 310, 319-322 [121 Cal.Rptr. 488, 535 P.2d 352] [due process requires proof beyond a reasonable doubt in 'mentally disordered sex offender' civil commitment proceedings]; *People* v. *Feagley* [(1975)] 14 Cal.3d [338,] 351 [121 Cal.Rptr. 509, 535 P.2d 373] [due process requires unanimous jury in 'mentally disordered sex offender' civil commitment proceedings]; *People* v. *Thomas* [(1977)] 19 Cal.3d [630,] 633, 644 [139 Cal.Rptr. 594, 566 P.2d 228] [due process requires unanimous jury and proof beyond a reasonable doubt in 'narcotics addict' civil commitment proceedings].)" (*County of Sutter* v. *Davis* (1991) 234 Cal.App.3d 319, 327-328 [285 Cal.Rptr. 736].)

■ " ' " 'In determining whether the action was one triable by a jury at common law, the court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case—the *gist* of the action. A jury trial must be granted where the *gist* of the action is legal, where the action is in reality cognizable at law.' " [Citation.] On the other hand, if the action is essentially one in equity and the relief sought "depends upon the application of equitable doctrines," the parties are not entitled to a jury trial. [Citations.] Although . . . "the legal or equitable nature of a cause of action ordinarily is determined by the mode of relief to be afforded" [citation], the prayer for relief in a particular case is not conclusive [citations]. Thus, "[t]he fact that damages is one of a full range of possible remedies does not guarantee . . . the right to a jury . . . ." [Citation.]' (*C & K Engineering Contractors* v. *Amber Steel Co.* (1978) 23 Cal.3d 1, 8-9 [151 Cal.Rptr. 323, 587 P.2d 1136] . . . see also *Walton* v. *Walton* (1995) 31 Cal.App.4th 277 [36 Cal.Rptr.2d 901].)" (*Martin* v. *County of Los Angeles* (1996) 51 Cal.App.4th 688, 694 [59 Cal.Rptr.2d 303].)

■ Mr. De Guere's second amended complaint alleges causes of action for breach of contract, declaratory relief, an accounting, and usury. In paragraph 9, he sets out the actions of Universal which, he claims, constituted breach of contract. Each relates to the accounting practices employed by Universal. The cause of action for declaratory relief alleges: "A dispute exists between plaintiff and defendants as to the proper manner for defendants to account to plaintiff for his share of net profits from the Series. Plaintiff has made demand on defendants to account in a certain manner pursuant to the Agreement, and defendants have refused that demand, and have continued to account to plaintiff in a manner which plaintiff contends is improper, illegal and unconscionable, . . ."

A cause of action for an accounting is an equitable proceeding to which no right to jury trial attaches. (*Van de Kamp* v. *Bank of America* (1988) 204 Cal.App.3d 819, 864 [251 Cal.Rptr. 530].) There is a right to jury trial on a cause of action for breach of contract. (*Raedeke* v. *Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671 [111 Cal.Rptr. 693, 517 P.2d 1157].)

Mr. De Guere's claim for damages for breach of contract is not determinative of the right to jury trial. (*Van de Kamp* v. *Bank of America, supra,* 204 Cal.App.3d at p. 865.) The fact that the amount of a defendant's liability to the plaintiff will be established by an accounting indicates that the action is equitable rather than legal. (*Ibid.*)

Here, in the breach of contract cause of action, Mr. De Guere lists 26 accounting practices by Universal which he claims were improper, and

which deprived him of his right to net profits. A significant number of these allegations relate to charges for items which were standard, rather than actual, costs. Other items relate to the classification of items as costs of production, rather than as expenses of distribution. Mr. De Guere also alleges that various improper practices related to distribution fees and expenses. In light of these allegations, we are satisfied that the gist of the action is for an accounting, and that there was no right to jury trial. (See *C & K Engineering Contractors* v. *Amber Steel Co.* (1978) 23 Cal.3d 1, 8-9 [151 Cal.Rptr. 323, 587 P.2d 1136].)

Only one of the twenty-six acts alleged in the cause of action for breach of contract presents an issue involving extrinsic facts beyond accounting practices. Mr. De Guere specifically alleges that Universal "understated the true amount that should have been received from the domestic television syndication of the Series, by collecting a below-market syndication license fee from the licensing of the Series in the New York market to television station WWOR, a station owned at the time" by Universal's parent company. While the resolution of this issue may depend on extrinsic, contested facts, that circumstance does not alter the nature of the action. The overwhelming gist of the action is equitable, relating to the accounting practices employed by Universal.

Nothing we have said is intended to affect our determination that Mr. De Guere is entitled to a trial on the issues of contract interpretation and enforceability. The question of his right to jury trial on those issues will depend on whether the parties present conflicting extrinsic evidence on the contract interpretation issues, as we discussed above.

### III

■ Mr. De Guere also argues that his right to due process was violated because he was not allowed to cross-examine Universal's declarants, or to present a rebuttal argument. As we have discussed, at the conclusion of the hearing before the referee, Universal's counsel said she did not intend to present further evidence unless it became necessary, depending on the referee's tentative report. During the colloquy between counsel and the referee, Mr. De Guere's attorney did not seek an opportunity to cross-examine Universal's declarants. Instead, he stated his desire to present evidentiary objections to the declarations, which he was permitted to do and did.

Universal did not ask for the opportunity to present further evidence after the referee issued his report. Because it did not, there was no need for Mr.

De Guere to present a rebuttal case. Nor did his attorney ask to do so. On this record, there was no violation of Mr. De Guere's due process rights.

## IV

Mr. De Guere argues the trial court erred in sustaining, without leave to amend, Universal's demurrer to his cause of action for usury. Paragraph 13 of the second amended complaint alleged: "The Agreement is, in reality and as interpreted by Universal in its accountings to plaintiff DeGuere, a loan transaction whereby (1) Universal loans money to produce the Series, (2) the Series is produced, primarily by payments to and charges made by Universal or its affiliates, (3) the loan is repaid by plaintiff, the sole profit participant in the Series, to Universal from the proceeds of the exploitation of the Series, prior to plaintiff's receiving any share of the net profits from the exploitation of the Series. The repayment of the loan to Universal is secured by Universal's ownership of all rights in the Series. Even though the proceeds from the exploitation of the Series are in excess of $311 million ($311,000,000), and the costs and expenses of producing and distributing the Series are a much lesser sum, Universal has charged plaintiff interest of over $69 million ($69,000,000), and has withheld payment of any profits from plaintiff on the ground that interest is still accruing."

California Constitution, article XV, section 1, provides that: "No person, association, copartnership or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than the interest authorized by this section upon any loan or forbearance of any money, goods or things in action." As summarized by our Supreme Court, "[t]he essential elements of usury are: (1) The transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction. [Citations.]" (*Ghirardo* v. *Antonioli, supra*, 8 Cal.4th at p. 798.) "A transaction is rebuttably presumed *not* to be usurious. [Citations.] The borrower bears the burden of proving the essential elements of a usurious transaction. [Citations.]" (*Id.* at pp. 798-799, original italics.)

The usury law applies only to transactions that amount to a loan or forbearance. "The constitutional proscription against usury applies by its express terms only to a '. . . loan or forbearance of any money, goods or things in action.' (Cal. Const., art. XV, § 1.) Without a loan or forbearance, usury cannot exist. [Citations.]" (8 Cal.4th at p. 801.)

The trial court sustained Universal's demurrer to the usury cause of action on the ground that the agreement is not a loan. "On appeal from a judgment

dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.]" (*Aubry* v. *Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967 [9 Cal.Rptr.2d 92, 831 P.2d 317].)

We agree with the trial court's analysis. Mr. De Guere fails to meet Universal's argument that the agreement does not require him to repay the costs of producing and distributing *Simon & Simon*. The agreement, which was incorporated by reference into the second amended complaint, provides a method of calculating interest on production costs, and of calculating net profits. These provisions do not constitute either a loan or forbearance.

### DISPOSITION

The judgment is affirmed as to dismissal of the cause of action for usury. The judgment is reversed and the case is remanded for the trial court to resolve the issues of contract interpretation and enforceability, in a manner consistent with the views expressed in this opinion. Mr. De Guere is to have his costs on appeal.

Hastings, J., and Aranda, J.,* concurred.

---

*Judge of the Municipal Court for the South Bay Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.